RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0143p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

No. 21-5945

*v.*

ANTWONE MIGUEL SANDERS,

*Defendant-Appellant.*

On Petition for Rehearing En Banc.
United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:20-cr-00009-1—Joseph M. Hood, District Judge.

Argued En Banc: October 18, 2023

Decided and Filed: June 28, 2024

Before: SUTTON, Chief Judge; MOORE, CLAY, GIBBONS, GRIFFIN,
KETHLEDGE, STRANCH, THAPAR, BUSH, LARSEN, NALBANDIAN, READLER,
MURPHY, DAVIS, MATHIS, and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED EN BANC:** Jarrod J. Beck, LAW OFFICE OF JARROD J. BECK, PLLC, Lexington, Kentucky, for Appellant. Sofia M. Vickery, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON SUPPLEMENTAL BRIEF:** Jarrod J. Beck, LAW OFFICE OF JARROD J. BECK, PLLC, Lexington, Kentucky, for Appellant. Sofia M. Vickery, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Charles P. Wisdom, Jr., Lauren Tanner Bradley, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

READLER, J., delivered the opinion of the court, in which SUTTON, C.J., and GIBBONS, KETHLEDGE, THAPAR, BUSH, LARSEN, NALBANDIAN, and MURPHY, JJ., joined in full, GRIFFIN, MATHIS, and DAVIS, JJ., joined in part and in the judgment, and STRANCH and BLOOMEKATZ, JJ., concurred in the judgment. GRIFFIN, J. (pp. 28–30), delivered a separate opinion concurring in the judgment and joining all but Section II.B.2.b. and Section III of the majority opinion. MATHIS, J. (pp. 31–34), delivered a separate opinion concurring in the judgment and joining the majority opinion in part, in which DAVIS, J., joined in full, and

STRANCH and BLOOMEKATZ, JJ., joined in parts I and II.  STRANCH and BLOOMEKATZ, JJ. (pp. 35–38), delivered a separate joint opinion concurring in the judgment, in which MATHIS, J., joined in part, and GRIFFIN and DAVIS, JJ., joined in Section II.  CLAY J. (pp. 39–60), delivered a separate dissenting opinion in which MOORE, J., joined in full.

———————————

**OPINION**

———————————

CHAD A. READLER, Circuit Judge.  A confidential informant notified officers that Antwone Sanders was dealing drugs from a nearby apartment.  The informant then engaged in two controlled drug buys with Sanders.  On both occasions, officers observed Sanders drive from the buy location to the apartment in question.  The officers detailed this information in an affidavit submitted to a judge and secured a warrant to search the apartment.  The search unearthed contraband sufficient to support several federal gun and drug possession charges.  Sanders moved to suppress the discovered items.  When his motion was denied, Sanders pleaded guilty, preserving in part his right to appeal, which he then exercised.

Longstanding Fourth Amendment principles guide our review of the search warrant's propriety.  One, we examine the underlying officer affidavit with the understanding that demonstrating probable cause to justify a search does not require mathematical certainty.  Two, we owe deference to the judge who found sufficient cause to issue the warrant.  Viewing Sanders's appeal in this way, we see no error in the district court's denial of the motion to suppress.  Nor did the district court err by denying Sanders's discovery requests.  Accordingly, we affirm.

**I.**

Lexington officer Brandon Hazlewood received a tip from a confidential informant that Antwone Sanders was selling heroin and fentanyl from Apartment D of 2852 Yellowstone Parkway.  The informant also shared a description of Sanders.  A search of a police database located a subject with a matching name and description, a person the informant later confirmed was the same Antwone Sanders who was the focus of the informant's tip.

Hazlewood, along with another officer, arranged a controlled buy between the informant and Sanders.  To prepare for the buy, the officers searched the informant and the informant's

vehicle, finding no contraband. Supplied with buy money, the informant proceeded to a "predetermined meet location." There, officers saw the informant enter a silver Chrysler. Moments later, the informant exited the vehicle. Sanders departed the scene in his Chrysler, with officers tailing him from the buy location directly back to the Yellowstone apartment. The informant meanwhile provided Hazlewood with the heroin and fentanyl purchased from Sanders. No other contraband was discovered on the informant or in the informant's car.

History would repeat itself. Within roughly a week, officers oversaw another controlled buy between Sanders and the informant. The buy was largely identical to the first, save for the fact that officers also surveilled Sanders before the buy, watching him leave the Yellowstone apartment, get into his Chrysler, and then drive immediately to the buy location. When Sanders arrived, he sold additional drugs to the informant and then returned to the apartment.

With this information, officers sought a warrant to search the Yellowstone apartment as well as Sanders and his Chrysler for heroin, fentanyl, drug trafficking paraphernalia, and other evidence (including "[m]onies" from drug crimes). To support the warrant application, Hazlewood relayed law enforcement's history with Sanders in an affidavit. A Kentucky state court judge authorized the search. Execution of the warrant yielded a bevy of incriminating items in the apartment, including roughly 30 grams of heroin and fentanyl, lesser amounts of cocaine, two handguns, and hundreds of dollars in cash.

Based on those discoveries, a federal grand jury indicted Sanders for violating 21 U.S.C. § 841(a)(1) by possessing heroin with the intent to distribute, 21 U.S.C. § 844(a)(1) by possessing cocaine, 18 U.S.C. § 924(c)(1) by possessing a firearm in furtherance of a drug trafficking crime, and 18 U.S.C. § 922(g)(1) by possessing a firearm as a felon.

Sanders filed a number of pretrial motions. First, he sought supplemental discovery from the government in the way of "case reports and drug evidence relating to the two controlled buys referenced in the search warrant affidavit." Second, Sanders moved to suppress all evidence resulting from the search of the apartment. In conjunction with that request, Sanders sought an evidentiary hearing to explore the surveillance conducted before the second controlled buy. Each request was denied. Sanders then pleaded guilty to three of the counts in the indictment (with the

government dropping the cocaine possession charge), preserving his ability to appeal threshold issues.  He was sentenced to 72 months and one day of imprisonment.

Sanders appealed.  A divided panel held that the district court erred in denying Sanders's motion to suppress, and, accordingly, vacated Sanders's conviction.  *See United States v. Sanders*, 59 F.4th 232 (6th Cir.), *reh'g en banc granted, opinion vacated*, 68 F.4th 1030 (6th Cir. 2023).  In dissent, Judge Nalbandian concluded that the warrant affidavit established probable cause.  *Id.* at 247 (Nalbandian, J., dissenting).  The United States sought rehearing by the en banc court.  We voted in favor of full court review, which served to vacate the panel decision and judgment.  *See* 6 Cir. R. 35(b).

## II.

Before the en banc court, Sanders presses two issues:  the denial of his motion to suppress (with an embedded claim that the district court should have held an evidentiary hearing concerning the veracity of the warrant); and the denial of his motion for supplemental discovery.

First, the motion to suppress.  Sanders contends that the warrant used to search the Yellowstone apartment violated the Fourth Amendment's command that warrants be issued only upon "probable cause." U.S. CONST. amend. IV.  In particular, Sanders faults the district court for concluding that the warrant had a "probable cause nexus."  That phrase of art reflects the requirement that an affidavit in support of a search warrant sufficiently show that the "specific 'things' to be searched for" (here, evidence of drug trafficking) are "located on the property to which entry is sought" (here, the Yellowstone apartment).  *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) (cleaned up); *United States v. Carpenter*, 360 F.3d 591, 594–95 (6th Cir. 2004) (en banc) (recognizing the nexus requirement).

The probable cause determination takes place on the front lines when a judge is asked to issue the warrant.  If execution of the warrant leads to federal charges, the issuing court's decision can be challenged in the district court by way of a suppression motion.  The terms of review are settled.  The district court must employ "great deference" when considering the issuing judge's probable cause determination.  *United States v. Christian*, 925 F.3d 305, 311–12 (6th Cir. 2019) (en banc) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)).  Accordingly, the district court

should "overturn that decision only if the [issuing judge] arbitrarily exercised" the judge's authority. *Id.* at 311–12 (cleaned up). In other words, it is of no moment whether the district court would have likewise issued the same warrant. In the end, what matters is whether the issuing judge had a "substantial basis for concluding that a search would uncover evidence of wrongdoing." *Gates*, 462 U.S. at 236 (cleaned up).

On appeal, we review the district court's factual findings for clear error. *See United States v. Prigmore*, 15 F.4th 768, 777 (6th Cir. 2021). And we assess its legal determinations de novo. *Id.* In so doing, we are mindful of the deference the district court was required to afford the issuing judge's decision to authorize the warrant.

**A.**

Today's question—what an officer must demonstrate to establish a probable cause nexus justifying the issuance of a search warrant—is a familiar one. Unlike other legal settings, we undertake this inquiry without a "neat set of legal rules." *Gates*, 462 U.S. at 232. The standard for probable cause, the Supreme Court has observed, is "incapable of precise definition or quantification into percentages." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). So in describing the concept, the Supreme Court often speaks in generalities. "Probable cause," it has explained, "exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Gates*, 462 U.S. at 238). Or it requires "reasonable cause" or "reasonable grounds to believe" that contraband will be located on the property to be searched. *Zurcher*, 436 U.S. at 556 & n.6 (quotation omitted). In the end, whatever nomenclature one uses to describe the concept, probable cause, at its core, "depends on the totality of the circumstances." *Pringle*, 540 U.S. at 371.

Our precedent thus reflects the fact-intensive nature of the probable cause inquiry. Every lawful search warrant affidavit generally includes details about the timeliness of the information presented, the nature of the crime involved, the objects to be seized, and the place to be searched. *See* Wayne R. LaFave, 2 Search & Seizure § 3.7(d) (6th ed. 2024); *United States v. Moore*, 661 F.3d 309, 311 (6th Cir. 2011). But there are other time-honored markers in our Fourth Amendment jurisprudence too, including tips to the police, controlled buys, trash pulls, police surveillance,

exploration of a suspect's criminal history, and averments about an officer's training and experience.

It follows that there is no model fact pattern for establishing a fair probability that contraband will be found at the place to be searched. Sometimes there is direct evidence, such as a credible informant's tip of criminal activity occurring in or directly outside of the location of the search. *See, e.g.*, *United States v. Hines*, 885 F.3d 919, 924 (6th Cir. 2018); *Moore*, 661 F.3d at 311; *United States v. Dyer*, 580 F.3d 386, 391 (6th Cir. 2009); *United States v. Jones*, 159 F.3d 969, 974 (6th Cir. 1998). Or the search warrant affidavit might indicate that the proceeds of a crime will be found in the place to be searched. *See, e.g.*, *United States v. Brooks*, 594 F.3d 488, 495 (6th Cir. 2010); *United States v. Rodriguez-Suazo*, 346 F.3d 637, 647 (6th Cir. 2003).

Other times, circumstantial evidence will do the trick. That is so where, for instance, officers, after observing a person leave a location, soon find the individual possessing contraband, possibly even engaging in a sale involving the contraband, suggesting that the illicit materials came from the location. *See, e.g.*, *United States v. White*, 990 F.3d 488, 490 (6th Cir. 2021); *Christian*, 925 F.3d at 310; *United States v. Crawford*, 943 F.3d 297, 309 (6th Cir. 2019). Other cases involve search warrants describing a controlled purchase of contraband followed by the defendant returning to the location sought to be searched, creating a reasonable inference that the defendant took the proceeds with him. *See, e.g.*, *United States v. Ellison*, 632 F.3d 347, 349 (6th Cir. 2011). Yet another set of cases involves a search warrant affidavit that adequately establishes both where a defendant resides as well as the defendant's active engagement in certain criminal activity. In those circumstances, an inference can reasonably be made (especially when aided by an affiant-officer's experience) that the "criminal suspect keeps the 'instrumentalities and fruits' of his crime in his residence." *United States v. Williams*, 544 F.3d 683, 688 (6th Cir. 2008) (gun crimes); *see also United States v. Elbe*, 774 F.3d 885, 890 (6th Cir. 2014) (child pornography); *United States v. Carney*, 675 F.3d 1007, 1013 (6th Cir. 2012) (counterfeiting); *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006) (financial crimes). Instances of this nature involving drug crimes are sometimes described as "known drug dealer" cases. *See, e.g.*, *United States v. Miggins*, 302 F.3d 384, 393–94 (6th Cir. 2002) (drug trafficking); *United States v. Kenny*, 505 F.3d 458, 461–62 (6th

Cir. 2007) (drug manufacturing). Many roads, in other words, can lead to a probable cause nexus, given its fact-intensive foundation.

That is not to say there are no guideposts—perhaps better described as "do not enter" signs—to direct us along the way. *See Gates*, 462 U.S. at 238; *Zurcher*, 436 U.S. at 556. As an en banc court, we identified two areas of caution five years ago when applying longstanding principles of probable cause. *See Christian*, 925 F.3d at 310–11.

The first concerns the nature of the government's burden. Because probable cause is not a "high bar," *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (cleaned up), it follows that a warrant's validity should not turn on whether it is supported by an "actual showing" of criminal activity at the targeted location, *Christian*, 925 F.3d at 311. We instead ask whether officers provided direct or circumstantial support to create "more than mere suspicion" that contraband will be found at the location in question. *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (citation omitted). Likewise, we do not ask whether other investigative methods were available to officers. *See Christian*, 925 F.3d at 310 (recognizing that while the affidavit at issue could have been "more precise," we do not hold it to such an "exacting degree of specificity"). Instead, our touchstone is simply whether the chosen means of investigation produced information that, as detailed in a warrant affidavit, adequately supports a finding of probable cause. In other words, we value the affidavit as we might those around us. We ask what good qualities it contains, not "what it lacks." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc).

We also addressed in *Christian* how to determine whether the issuing judge had a substantial basis to think the government satisfied this burden. Critically, we do not scrutinize a warrant affidavit in a "hypertechnical" or "line-by-line" manner. *Christian*, 925 F.3d at 311 (quoting *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004)); *see also Wesby*, 538 U.S. at 61 (rejecting a "divide-and-conquer" approach to probable cause determinations (citation omitted)). The proper approach, rather, is a holistic one. We consider the "'totality of the circumstances' constellation" underlying probable cause, viewing each data point as a star in the collection. *Christian*, 925 F.3d at 311 (citation omitted).

**B.**

1. Measured by these settled principles, the supporting affidavit here cleared the modest probable cause bar.

The controlled buys themselves justified a finding of probable cause. Take the second buy. Sanders left the apartment, got in his vehicle, and drove directly to the buy location. At that point, the informant entered the car with buy money and left with heroin and fentanyl. Sanders then returned to the apartment, parking his car outside before entering the building. On this record, the informant could have obtained the drugs only from Sanders, who had traveled directly from the apartment to meet the informant. Evidence that one leaves a "residence, engage[s] in a drug transaction, and then return[s] into the residence" "plainly demonstrate[s] a sufficient nexus" with the location. *Ellison*, 632 F.3d at 349; *United States v. Jones*, 817 F.3d 489, 492 (6th Cir. 2016) ("What matters is . . . that [the defendant] left [the location to be searched] and drove straight to a drug deal in which he was the seller."); *see also* Dissenting Op. at 46 (acknowledging that where police "witness[] a suspect leave his apartment, participate in a drug transaction, and then immediately return to the apartment," significant "indicia of probability" bless a subsequent search of that location).

This evidence alone would end the matter. Yet there is more. We have an earlier controlled buy, with many features like the one just described. And the search warrant sought not just drugs, but also the proceeds of drug trafficking. There was good reason for the officers to target those latter items. Officers twice witnessed Sanders drive away from the meet location with buy money, park his car, and go straight into the apartment. Other than reaching the unlikely conclusion that Sanders left those amounts in his vehicle parked outside, it was fair for officers to assume based on the evidence before them that the proceeds were taken into the apartment. *See Christian*, 925 F.3d at 311 (asking whether the issuing judge's determination was arbitrary); *see also United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006) (recognizing that warrant affidavits "[m]ust be tested and interpreted by magistrates and courts in a commonsense and realistic fashion" (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965))).

The initial tip that Sanders was selling heroin and fentanyl from the apartment only adds to what is already obvious. An informant who seemingly was known to the officers—recall that the informant met with the officers in person and promptly engaged in two controlled buys—was immediately proven right twice over through those transactions. All of this suggests the informant's initial tip was quite credible. *See United States v. May*, 399 F.3d 817, 824–25 (6th Cir. 2005) (noting value of a known informant's tip); *Dyer*, 580 F.3d at 391–92 (similar); *see also United States v. Howard*, 632 F. App'x 795, 802 (6th Cir. 2015) (recognizing reliability of an informant who engages in controlled buys); *United States v. Moore*, 999 F.3d 993, 997 (6th Cir. 2021) (collecting cases holding that a confidential informant's credibility can be corroborated with a controlled buy). And a sufficiently reliable tip can help establish probable cause. *See Gates*, 462 U.S. at 233.

The search warrant affidavit reflected all of these markers. On this record, a substantial basis supported the issuing judge's conclusion that evidence of drug trafficking would be found at the Yellowstone apartment.

2.a. Sanders faults the warrant affidavit in multiple respects, starting with the informant's tip. Specifically, he criticizes the affidavit for failing to address the informant's basis of knowledge, past relationship with law enforcement, or knowledge about the inside of the apartment. The thrust of the dissenting opinion makes a similar point, questioning the specificity of the informant's statements. *See* Dissenting Op. at 40–43, 50–52. These are fair critiques. Yet none come close to being fatal. For one, the tip was not a vital component of the probable cause equation. That sets Sanders's case apart from *United States v. Higgins*, 557 F.3d 381, 389 (6th Cir. 2009), a case emphasized by the dissenting opinion, where the warrant affidavit relied exclusively on an informant's tip to show probable cause. For another, more broadly, a warrant affidavit need not discuss the basis for the informant's tip. *Gates*, 462 U.S. at 233. Nor must it spell out background information about an informant, *see Hines*, 885 F.3d at 924, or provide detail about the place to be searched, *see Massachusetts v. Upton*, 466 U.S. 727, 731, 733–34 (1984) (per curiam) (upholding probable cause finding based on a tip, even though the tipster "did not specifically state that she saw [the stolen items] in the motor home"). At day's end, we assess

what the affidavit said about the informant's tip, not what it did not. *Allen*, 211 F.3d at 975. And here, as discussed, there was ample evidence to infer that the tip was worth pursuing.

b. Sanders, echoed by the dissenting opinion, next maintains that the facts in a warrant affidavit must show two things: one, that the residence to be searched was the suspect's home, and, two, that the home had been used in drug trafficking (for instance, that someone witnessed a drug deal or drug paraphernalia in or near the residence). And, they add, the affidavit here flunks that test, as it failed to include direct evidence that contraband was previously seen in or near Sanders's apartment. *See* Dissenting Op. at 41, 44–45 (criticizing the affidavit for lacking the "key detail[s]" that "Sanders resided at the Yellowstone [] apartment" as well as evidence akin to "personal observations of drug deals or drug paraphernalia in the residence").

This shared view rests on a misunderstanding of our decisions involving so-called known drug dealers. A few points of clarification are in order, for today and beyond. Customarily, known drug dealer cases involve a search warrant affidavit indicating that a drug dealer lives at a certain location. *See United States v. Reed*, 993 F.3d 441, 444 (6th Cir. 2021). At the same time, the affidavit typically lacks "facts indicating that the defendant was dealing drugs from his residence." *United States v. McCoy*, 905 F.3d 409, 418 (6th Cir. 2018). That record tees up the question whether a judge can infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking. *See Reed*, 993 F.3d at 450–52 (discussing intracircuit debate); *United States v. Ardd*, 911 F.3d 348, 351–52 (6th Cir. 2018) (same).

Historically, our cases have blessed the inference that "in the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Davidson*, 936 F.2d 856, 860 (6th Cir. 1991) (citation omitted); *see also Jones*, 159 F.3d at 975 (same). In taking this approach, we stand in good company. *See, e.g.*, *United States v. Feliz*, 182 F.3d 82, 87–88 (1st Cir. 1999); *United States v. Benevento*, 836 F.2d 60, 70–71 (2d Cir. 1987), *abrogated on other grounds by United States v. Indelicato*, 865 F.2d 1370 (2d Cir. 1989) (en banc); *United States v. Whitner*, 219 F.3d 289, 297–98 (3d Cir. 2000); *United States v. Williams*, 974 F.2d 480, 481–82 (4th Cir. 1992) (per curiam); *United States v. Robins*, 978 F.2d 881, 892 (5th Cir. 1992); *United States v. Zamudio*, 909 F.3d 172, 176 (7th Cir. 2018); *United States v. Luloff*, 15 F.3d 763, 768 (8th Cir. 1994); *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986); *United States v. $149,442.43 in U.S.*

*Currency*, 965 F.2d 868, 874 (10th Cir. 1992); *United States v. Joseph*, 709 F.3d 1082, 1100 (11th Cir. 2013), *abrogated on other grounds by United States v. Ruan*, 56 F.4th 1291 (11th Cir. 2023); *United States v. Cardoza*, 713 F.3d 656, 661 (D.C. Cir. 2013); *see also* LaFave, *supra* § 3.7(d) ("[M]any courts have been disinclined to require such facts in the particular case to support that inference. Rather, it is commonly held that this gap can be filled merely on the basis . . . that drug dealers ordinarily keep their supply, records and monetary profits at home."). And the inference, it bears noting, is more than mere supposition. As now-Justice Kavanaugh keenly reminded us, "drug dealers don't tend to work out of office buildings":

> Common experience suggests that drug dealers must mix and measure the merchandise, protect it from competitors, and conceal evidence of their trade—such as drugs, drug paraphernalia, weapons, written records, and cash—in secure locations. For the vast majority of drug dealers, the most convenient location to secure items is the home. After all, drug dealers don't tend to work out of office buildings. And no training is required to reach this commonsense conclusion.

*United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008) (Kavanaugh, J.).

Invoking a thin strand of cases, Sanders and the dissenting opinion contend that a probable cause nexus can never be satisfied by a warrant affidavit that establishes only that a defendant is a known drug dealer who lives at a certain location, *see, e.g.*, *United States v. Brown*, 828 F.3d 375, 383–84 (6th Cir. 2016); *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005); Dissenting Op. at 41 (describing *Brown* as "control[ling] this case"). To the extent we have ever suggested as much, the weight of our case law, as it does in so many probable cause contexts, rejects such a bright-line rule. *See United States v. Sheckles*, 996 F.3d 330, 342 (6th Cir. 2021). We do so again today.

Yet in rejecting one categorical rule, we should not be understood to erect a different one, this time pointing in the opposite direction. That the known drug dealer "inference can be drawn permissibly in some cases" does not mean that probable cause is necessarily satisfied whenever the home of someone connected to a drug trafficking crime is identified. *See United States v. McPhearson*, 469 F.3d 518, 524 (6th Cir. 2006). When it comes to probable cause, it bears repeating, there are few absolutes.

As before, probable cause to search a known drug dealer's residence is established where the dealer is engaged in "'continual and ongoing operations' typically involving large amounts of drugs." *See Sheckles*, 996 F.3d at 342. Not every warrant will demonstrate as much, as our cases have shown. A warrant deemed deficient in this setting generally either fails to establish that a given location was where the dealer lived or fails to provide recent evidence of active drug trafficking by the accused dealer. *See, e.g.*, *United States v. Grant*, No. 21-3686, 2023 WL 119399, at *3 (6th Cir. Jan. 6, 2023); *United States v. Ward*, 967 F.3d 550, 555–57 (6th Cir. 2020); *McCoy*, 905 F.3d at 417, 419 & n.5; *Brown*, 828 F.3d at 383–84; *Higgins*, 557 F.3d at 390; *McPhearson*, 469 F.3d at 524–25; *United States v. Hython*, 443 F.3d 480, 486 (6th Cir. 2006). Contrary to Sanders's belief, however, a warrant's shortcomings have not been due to the lack of direct evidence about the happenings inside the residence. Remember, if the evidence plainly establishes drug dealing at one's home, there is no need for an inference as to whether evidence of drug dealing will be found inside. So Sanders's suggestion that the warrant affidavit here had to include direct evidence of drug trafficking within the apartment simply misunderstands our case law.

Using the appropriate lens for our known drug dealer case law, then, Sanders's and the dissenting opinion's preferred approach is off base. This is not a known drug dealer case, as that phrase is understood by the weight of our case law. Nothing in the affidavit suggests that Sanders lived at the apartment. Nor does the propriety of the warrant depend on the inference that known drug dealers are likely to keep evidence of drug trafficking where they reside. Instead, the warrant affidavit established a probable cause nexus with the apartment through the totality of the information included therein—namely, two controlled buys with direct connections to the apartment along with a credible tip. Outside of stray suggestions in the known drug dealer context, we have never required "prior, actual observation of all the items listed in a search warrant" to establish a probable cause nexus; circumstantial evidence that contraband might be found at the place to be searched suffices. *Jones*, 159 F.3d at 974. As a result, criticism that the affidavit in this case failed to include a statement that, in the officer's view, drug traffickers tend to store evidence in their homes is a nonstarter.

Equally unavailing is Sanders's argument that the warrant only "establishes" that evidence of drug trafficking occurred in Sanders's Chrysler, distinguishing between his car and the

apartment. That is an odd way to think about probable cause. All seem to agree that there was a near certainty that drug trafficking evidence existed in the Chrysler, in light of the two controlled drug buys. Whether such evidence also existed in the apartment was perhaps less certain. But we do not diminish the evidence suggesting drugs would be found in the apartment by comparing it to the probability of the same in the vehicle. *See United States v. Stearn*, 597 F.3d 540, 560 (3d Cir. 2010) (recognizing that "even if another location is an equally likely repository of evidence, a magistrate may infer probable cause to search" a residence based on circumstantial evidence establishing a "fair probability that contraband or evidence of a crime will be found in a particular place") (citation omitted). Nor, it bears repeating, is certainty the touchstone for probable cause. *Wesby*, 583 U.S. at 57; *White*, 990 F.3d at 492 ("Probable cause does not demand resolving each jot and tittle of metaphysical doubt."). Relatedly, Sanders offers no support for his suggestion that probable cause to search his car negates probable cause to search the apartment. One could conjure up a world where Sanders limited his drug dealing to his vehicle. But "[a]n issuing judge need not eliminate every alternative explanation to find a 'fair probability' that contraband will be present." *White*, 990 F.3d at 492–93. Given the evidence connecting Sanders's drug trafficking with the apartment, the judge did not arbitrarily issue the search warrant.

c. Sanders's remaining criticisms of the affidavit merit little discussion. He points to cases where, unlike here, the warrant affidavit included details about suspects carrying items that might indicate drug activity (e.g., a white plastic bag) from the place to be searched. *See, e.g.*, *Crawford*, 943 F.3d at 308–09; *United States v. Miller*, 850 F. App'x 370, 374 (6th Cir. 2021). But none of those cases hinged on such a fact, let alone suggested that probable cause is limited to cases involving less careful criminals. *See Crawford*, 943 F.3d at 309 (discussing the observation of a "duffle bag" as one of several facts supporting probable cause determination). Nor do we agree with Sanders that the affidavit relied on stale information. The tip arrived roughly a week before the officer submitted his affidavit. In these circumstances, information even twice as old customarily is not considered stale. *See Moore*, 999 F.3d at 998. The tip here thus falls well short of any proposed expiration date.

In the end, Sanders casts little doubt on the decision to issue the warrant used to search the Yellowstone apartment.

**C.**

Apart from whether the search warrant satisfied the Fourth Amendment's probable cause requirement, there is an independent reason why the evidence unearthed at the Yellowstone apartment need not be suppressed:  the officers acted in good faith in securing the warrant.  *See Christian*, 925 F.3d at 312 (addressing good faith after concluding probable cause existed).

Consider some background principles underlying this well-tilled legal terrain.  Excluding unlawfully seized evidence in criminal proceedings is not required by the Constitution.  Instead, the exclusionary rule is a judicially crafted remedy for Fourth Amendment violations.  *Utah v. Strieff*, 579 U.S. 232, 237 (2016).  The rule's sole purpose is to deter police misconduct.  *Davis v. United States*, 564 U.S. 229, 236–38 (2011).  To achieve that aim, a court will suppress evidence obtained through an officer's "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."  *Herring v. United States*, 555 U.S. 135, 144 (2009).  But if an officer acts with an objectively "reasonable good-faith belief" that her conduct is lawful, exclusion is unwarranted.  *Davis*, 564 U.S. at 238 (citation omitted).

This latter command informs how the exclusionary rule applies when a warrant falls short of establishing probable cause.  In its seminal decision, *United States v. Leon*, the Supreme Court held that suppression is not an available remedy when officers conduct a search in good faith reliance on a judicially authorized warrant.  468 U.S. 897, 909, 922 (1984).  In that instance, any error in the probable cause calculus likely belongs to the judicial officer issuing the warrant, not the law enforcement officer seeking it, thereby undermining the grounds for exclusion based on misconduct.  *Davis*, 564 U.S. at 239.  Nor do we customarily expect an officer to second guess a judge's probable cause determination, given both the nature of the inquiry and the judicial officer's role in undertaking it.  *Leon*, 468 U.S. at 921.

That is the thrust of *Leon*'s exception to the exclusionary rule.  But it is not the end of the road.  For the *Leon* exception has its own exceptions.  And Sanders invokes two of them for our consideration.

1. *Bare Bones Affidavit.*

a.  Sanders leads with *Leon*'s exception for a warrant that is "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"  468 U.S. at 923 (quotation omitted).  By relying on a so-called "bare-bones affidavit," an officer does not act in objectively reasonable good faith and thus remains blameworthy for conducting the search, despite having a warrant. *Reed*, 993 F.3d at 450.  When, then, is a search warrant affidavit so deficient that it not only fails to establish a "probable cause nexus," but is also "bare bones"?

*Leon* identified a trio of skeletal affidavits.  468 U.S. at 915.  One was the affidavit at issue in a Prohibition era case, *Nathanson v. United States*, 290 U.S. 41 (1933).  Bare hardly begins to describe the document there—it consisted solely of a statement that the affiant "has cause to suspect and does believe" that illicit liquor "is now deposited and contained" at the location to be searched. *Id.* at 44.  Next was the affidavit supporting an arrest warrant in *Giordenello v. United States*, 357 U.S. 480 (1958).  That submission simply indicated that named witnesses alleged that the defendant "did receive [and] conceal . . . heroin hydrochloride" in violation of federal law. *Id.* at 481.  Last was the affidavit from *Aguilar v. Texas*, 378 U.S. 108 (1964).  It informed the judge only that officers had "received reliable information from a credible person" that allowed them to "believe that heroin, marijuana, barbiturates and other narcotics and narcotic paraphernalia [were] being kept at" the place to be searched. *Id.* at 109 & n.1.  Together, these "prototypes" give a sense, but "do not represent the universe of unacceptable affidavits." *United States v. White*, 874 F.3d 490, 499 (6th Cir. 2017).

In line with these examples, we have reserved the moniker "bare bones" for affidavits that are either "completely devoid of any nexus between" the illegal activity and the place to be searched or the item to be seized, *Carpenter*, 360 F.3d at 595–96, or "merely state[] suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge," *Christian*, 925 F.3d at 312 (cleaned up).  Put another way, bare bones affidavits nakedly assume or vaguely conclude, without attempting to demonstrate why, probable cause has been satisfied. *See United States v. Baker*, 976 F.3d 636, 647 (6th Cir. 2020); *see also United States v. Gilbert*, 952 F.3d 759, 765 (6th Cir. 2020); *White*, 874 F.3d at

498–99. In those circumstances an officer has not acted in "objectively reasonable good faith" in relying on such a warrant, thereby justifying application of the exclusionary rule. *See White*, 874 F.3d at 497. On the other hand, where an affidavit presents a "modicum of evidence, however slight," showing "*some* connection, regardless of how remote it may have been" between the "criminal activity at issue" and location of the search, *id.* (cleaned up), there exists a "minimally sufficient nexus" necessitating application of the good faith rule, *see Carpenter*, 360 F.3d at 596. Collectively, our bare bones affidavit case law sets a bright out-of-bounds marker governing officer conduct. *See United States v. Watson*, 498 F.3d 429, 431–32 (6th Cir. 2007); *Reed*, 993 F.3d at 452.

b. Did the affidavit here entirely fail to connect the evidence of wrongdoing (drug trafficking) to the place to be searched (the apartment)? No. The affidavit detailed three separate ties between Sanders's drug dealing and that location. One, the first controlled buy, followed by Sanders returning to the apartment. Two, the second controlled buy, which mirrored the first and added that Sanders came to the second buy from the apartment. And three, the informant's tip that Sanders was trafficking in drugs from the apartment. In other words, the affidavit did not blindly guess that evidence of drug trafficking would be discovered at the apartment. It had more than "a modicum of evidence." Indeed, much more.

At bottom, we see no indication that the officers were on clear notice that Hazlewood's affidavit was so deficient that they acted deliberately, recklessly, or grossly negligent in not second-guessing the judge's decision. Nor has there been a showing of "recurring or systemic negligence." *See Herring*, 555 U.S. at 144. The affidavit here is far more informative from the triumvirate of paradigmatic bare bones affidavits cited in *Leon*. Our prior cases point in the same direction. Hazlewood's affidavit is in line with others in which we found the existence of a minimally sufficient nexus. *See, e.g.*, *Higgins*, 557 F.3d at 391 (applying *Leon* to uphold a warrant procured through an affidavit supported by an untested informant's assertion that he had just purchased drugs at the home to be searched); *United States v. Van Shutters*, 163 F.3d 331, 336 (6th Cir. 1998) (minimally sufficient nexus established by an experienced officer's allegation, based on his personal knowledge, that rooms within a residence were "available" to a person engaging in a counterfeiting scheme); *United States v. Schultz*, 14 F.3d 1093, 1098 (6th Cir. 1994) (refusing

to exclude evidence from a search of a bank safety deposit box supported by affidavit that hinged on averments that the officer's training and experience led him to believe that evidence would be located there); *United States v. Savoca*, 761 F.2d 292, 298 (6th Cir. 1985) (concluding officers reasonably relied on a warrant to search a hotel room for evidence concerning a bank robbery based solely on the fact that the robbers were previously seen in the room more than once). All in all, the warrant affidavit here was not bare bones.

Sanders disagrees. In most respects, his *Leon*-based challenges are indistinguishable from his challenges to the probable cause finding. For instance, he again criticizes the affidavit for failing to explain better the informant's tip, Sanders's relationship with the apartment, or the nature of the drug trafficking occurring there. But we have repeatedly cautioned against conflating the separate skeletal affidavit and probable cause standards. *See White*, 874 F.3d at 497; *Gilbert*, 952 F.3d at 763 (citing *Christian*, 925 F.3d at 318 (Thapar, J., concurring)). At a broad level, of course, whether an affidavit lacks probable cause or can be described as bare bones both depend on how much evidence connects the underlying criminal activity with a person, place, or item. But the similarities end there. The probable cause inquiry, remember, focuses on the probability that evidence of a crime will be found in a particular place. *Grubbs*, 547 U.S. at 95. *Leon*'s bare bones exception, on the other hand, concerns the officer's objective blameworthiness. *See Davis*, 564 U.S. at 239. Sanders's critique of the finer points of the affidavit, in other words, are the province of probable cause, not *Leon* good faith. *See Gates*, 462 U.S. at 232.

Sanders resurrects other points as well. Many are premised on strands of our known drug dealer jurisprudence. We have already explained how Sanders misunderstands those decisions. And even then, given the previously conflicting conclusions in that line of cases, we have repeatedly forgiven officers on good faith grounds for failing to appreciate our precedential nuances. *See Ardd*, 911 F.3d at 351–52; *Reed*, 993 F.3d at 452.

In something akin to a negligence inquiry, Sanders next posits that no "reasonable officer[]" would have relied on Hazlewood's affidavit without seeking additional corroboration. Sanders questions why the officers did not further surveil the apartment, conduct a trash pull, or separately engage in more extensive public records searches to determine whether Sanders lived at the apartment. But this sort of Monday morning reasonableness assessment has no home in our

bare bones affidavit case law.  *See, e.g.*, *White*, 874 F.3d at 497.  Why would we require an officer to undertake an exhaustive investigation to confirm the probable cause that, to his mind, already existed?  *See Allen*, 211 F.3d at 976.  Especially when, as here, officers were in a time-sensitive pursuit of a fentanyl dealer, one who ended up possessing over 30 grams of the substance, a few milligrams of which are potentially fatal.  *See* U.S. Drug Enf't Admin., *Facts About Fentanyl*, https://perma.cc/DTA9-BP5U (last visited June 27, 2024).

Lastly, Sanders attempts to distinguish two cases where we held that *Leon* did apply: *United States v. Washington*, 380 F.3d 236 (6th Cir. 2004), and our en banc decision in *Carpenter*. Even if these cases are distinguishable, *but see Sanders*, 59 F.4th at 254 (Nalbandian, J., dissenting), we do not ask nonlawyer officers to discern the fine legal distinctions between one case and the next, let alone take heed from those distinctions that the affidavit here was out of bounds, as the dissenting opinion would do.  *Reed*, 993 F.3d at 452 (reserving *Leon*'s bare bones exception to "obvious" cases); *see* Dissenting Op. at 53–54 (comparing this case to other applications of the good faith rule).  *Washington*, in fact, did not even render a holding on probable cause, 380 F.3d at 240, making it a particularly poor guide.  *Cf. Salazar v. Molina*, 37 F.4th 278, 286 (5th Cir. 2022) (observing that a case "cannot clearly establish the law [when] the court found no Fourth Amendment violation").

### 2. *Franks*.

*Leon*'s good faith exception likewise "does not apply when the supporting affidavit contained knowing or reckless falsity in violation of" *Franks v. Delaware*, 438 U.S. 154 (1978). *United States v. Abernathy*, 843 F.3d 243, 257 (6th Cir. 2016) (cleaned up).  *Franks* set forth a regimented process for establishing such a knowing or reckless falsity.  We start from the premise that warrant affidavits have "a presumption of validity," 438 U.S. at 171, making Sanders's task of seeking exclusion under *Franks* a tall one.  He must first make a "substantial preliminary showing" that the affidavit contains a knowing, intentional, or reckless falsehood.  *Id.* at 155–56. He must likewise show that the affidavit would not have established probable cause without the falsity, as *Franks* does not extend to immaterial falsehoods.  *Id*. at 171–72.  Assuming these initial burdens are met, the district court would hold an evidentiary hearing to determine if Sanders can further support his allegations by a preponderance of the evidence.  *Id.* at 156, 169–70.  Only if

Sanders shoulders this "heavy burden" would the evidence derived from the search warrant be suppressed. *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990).

Sanders maintains that one part of the warrant affidavit—the assertion that he traveled from the apartment to the site of the second buy—"may violate *Franks*." Appellant's Br. at 36. Why? Because of an audio recording in an unrelated case. In that recording, an officer refers to a fellow officer—one who was later involved in the surveillance of Sanders before the second buy—as unethical. Based on this audio alone, Sanders believes that the district court should have conducted an evidentiary hearing to gauge the veracity of the search warrant affidavit as it concerned the purportedly unethical officer and, in turn, excluded any tainted evidence derived from the search.

Sanders's basis for exclusion under *Franks* is underwhelming. He does not establish a falsehood in the warrant affidavit regarding the second controlled buy, let alone one that was made with the requisite intent. Indeed, Sanders fails to provide any evidence suggesting that he did not go directly from the apartment to the buy site. *See Franks*, 438 U.S. at 171 ("Affidavits or sworn or otherwise reliable statements of witnesses should be furnished [to support an allegation of a falsehood], or their absence satisfactorily explained."). Instead, he merely points to the recording, which says nothing about the Sanders investigation and contains only general references to a single officer's lax ethics, without reference to any specific investigative shortcoming. This vague, conclusory assertion falls well short of a "substantial preliminary showing" that the affidavit contains a knowing, intentional, or reckless falsehood. *See United States v. Young*, 847 F.3d 328, 348–49 (6th Cir. 2017) (recognizing that a defendant must do more than make a bald allegation that an officer was intending to mislead the issuing judge); *United States v. Damrah*, 412 F.3d 618, 625 (6th Cir. 2005) (rejecting a "non-specific and unsupported" *Franks* attack). Nor, for that matter, does it come close to showing that Hazlewood, the affiant, knew (or recklessly disregarded the fact) that false information was conveyed to him by the supposedly unethical officer. *See Leon*, 468 U.S. at 923; *see also United States v. O'Neill*, 94 F.4th 531, 539–40 (6th Cir. 2024) (recognizing that an officer must, at a minimum, consciously harbor doubt about the accuracy of her affidavit to trigger exclusion under *Franks*).

Sanders also fails on *Franks*'s materiality prong. Keep in mind that the purportedly unethical officer in question added one ingredient to the probable cause mixture: he observed

Sanders exit the apartment and enter his vehicle before the second buy.  Yet the warrant affidavit continues.  It says that "[o]fficers" then "followed the vehicle from [the apartment] uninterrupted to the" buy location.  In other words, beyond the officer in question, at least one other officer, whom we must presume supplied truthful information to the affiant, also saw Sanders drive directly from the apartment to the second controlled buy.  Excising any taint from one officer thus does not undermine the probable cause determination.   And then consider the officers' observations regarding the first controlled buy, which more than sealed the deal.  In the end, two controlled buys and a credible informant's tip all linked Sanders's drug dealing to the apartment.  As a result, Sanders did not deserve a *Franks* hearing, let alone exclusion.

*    *    *    *    *

The district court did not err in refusing to suppress the evidence resulting from the search of the Yellowstone apartment.

**III.**

Sanders's final argument concerns his motion for supplemental discovery under Federal Rule of Criminal Procedure 16.  As a starting point, discovery in criminal cases customarily is modest when compared with civil litigation.  The Constitution affords a criminal defendant no general right to discovery.  *See Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).  Grounds for discovery accordingly are targeted.  The Constitution provides one of them:  due process prohibits the government from suppressing material evidence that is favorable to the defense.  *See Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also Giglio v. United States*, 405 U.S. 150, 154–55 (1972) (extending *Brady* to evidence that could be used to impeach the credibility of a government witness).  Congress provided another in the Jencks Act.  Under that law, the government, on the motion of a defendant, typically must produce statements or reports it "possess[es]" made by its witnesses that "relate[] to the subject matter as to which the witness has testified."  18 U.S.C. § 3500(b).

Beyond those relatively narrow avenues, "Rule 16 is the primary means of discovery in criminal cases." *United States v. Llanez-Garcia*, 735 F.3d 483, 493 (6th Cir. 2013); *United States v. Presser*, 844 F.2d 1275, 1285 n.12 (6th Cir. 1988) (discussing *Brady*, the Jencks Act, and Rule

16 as generally constituting the "universe of discovery to which the defendant is entitled"). Rule 16 identifies categories of information the government must disclose to a defendant "[u]pon . . . request." *See, e.g.*, Fed. R. Crim. P. 16(a)(1)(A) (defendant's oral statements made before or after arrest); *id.* 16(a)(1)(B) (relevant written or recorded statements by defendant); *id.* 16(a)(1)(F) (results or reports of any physical or mental examinations or any scientific test); *id.* 16(a)(1)(G) (expert witnesses). Relevant here is the provision requiring disclosure of government documents and objects that are "material to preparing the defense;" "intend[ed]" for "use" in the government's "case-in-chief at trial;" or were "obtained from or belong[] to the defendant." *Id.* 16(a)(1)(E)(i)–(iii).

Invoking Rule 16(a)(1)(E), Sanders sought disclosure of two categories of documents relating to the controlled buys discussed in the search warrant affidavit. The first was a category of information he loosely described as "case reports." Sanders offered several justifications for why he needed those reports, which he generally tied to his objections to the issuance of the search warrant. The district court, however, was unmoved. It denied Sanders's request on the basis that the "case reports" were "too attenuated to be material [to preparing the defense] under Rule 16(a)(1)(E)(i)."

Sanders also sought discovery into the drugs exchanged during the controlled buys. Again, he encountered resistance. The district court denied this request, too, holding that Sanders's proposed disclosures would not be material to his defense.

We review those decisions for an abuse of discretion. *United States v. Jordan*, 544 F.3d 656, 667 (6th Cir. 2008). In practice, that means we will leave them untouched unless we have "a definite and firm conviction that the district court committed a clear error of judgment." *United States v. Ramirez-Figueredo*, 33 F.4th 312, 318 (6th Cir. 2022) (citation omitted). On balance, we see no abuse of discretion in denying Sanders additional discovery under Rule 16(a)(1)(E).

**A.**

Begin with whether Rule 16 required the government to disclose "case reports" regarding the investigation leading to the search warrant. Sanders's request poses a threshold inquiry—what, in his mind, is a case report? By and large, production of that category of information appears to

be in tension with Rule 16(a)(2)'s prohibition on the disclosure of "reports, memoranda, or other internal government documents made by" a government agent "in connection with investigating" a case.  Perhaps Sanders has something else in mind.  But that was for him to say, which he failed to do.  So his request appears to falter from the start.

Assuming there is an identifiable body of "case reports" that falls outside of Rule 16(a)(2)'s prohibition, Sanders still must show how the Rule validates his demand.  To his mind, production of the reports is authorized by Rule 16(a)(1)(E)(i), which allows for the disclosure of an "item" that "is material to preparing the defense."  He believes that is so for two reasons.

1.  To start, Sanders says the reports would aid him in challenging the warrant authorizing the search of the apartment.  Underlying Sanders's assertion is the belief that the term "defense" in Rule 16(a)(1)(E)(i) allows for the disclosure of any item that can materially help Sanders in any way against the prosecution.  The government, on the other hand, views "defense" as referring only to a defense on the merits of the various possession charges—a definition that the government says the evidence Sanders seeks does not meet.

However one might resolve this debate as an initial matter, we must take heed of holdings from the Supreme Court.  And here, the Supreme Court has answered this question in the government's favor.  Consider *United States v. Armstrong*, 517 U.S. 456 (1996).  Confronted with an earlier (but substantively indistinguishable) version of Rule 16, *Armstrong* interpreted "defense" to mean the "defendant's response to the Government's case in chief."  *Id.* at 462.  In so doing, the Supreme Court cabined discovery in this setting to "shield" claims—that is, evidence that "refute[s] the Government's arguments that the defendant committed the crime charged."  *Id.* And it contrasted that circumstance with one in which the defendant seeks to use the discovery as a "sword"—for example, in *Armstrong*, to challenge the "prosecution's conduct of the case."  *Id.* In that way, the Supreme Court opted against a more expansive reading of the term "defense," one that would have encompassed any evidence pertaining to a claim that "results in nonconviction." *Id.* at 462–63.

Our cases following *Armstrong* have imposed similar limits. We have uniformly held that Rule 16(a)(1)(E)(i) allows for production of only those items that would "help [the defendant] combat the government's case against him as to one of the charged crimes." *United States v. Harney*, 934 F.3d 502, 508 (6th Cir. 2019) (citing *Armstrong*, 517 U.S. at 462); *see United States v. McCaleb*, 302 F. App'x 410, 415 (6th Cir. 2008) (interpreting *Armstrong* as limiting Rule 16(a)(1)(E)(i) discovery to materials that help the defendant "contradict[] the Government's case"). Said differently, Rule 16 "applies only to shield claims that refute the Government's arguments that the defendant committed" the offenses in the indictment. *United States v. Pirosko*, 787 F.3d 358, 367 (6th Cir. 2015) (cleaned up); *United States v. Semrau*, 693 F.3d 510, 529 (6th Cir. 2012) (similar). In line with this understanding, we have rejected the argument that Rule 16 requires unlimited "disclosure of the government's investigative practices[.]" *United States v. Warshak*, 631 F.3d 266, 327 (6th Cir. 2010).

This understanding forecloses Sanders's argument. *Armstrong* required disclosure under Rule 16 for evidence that "refute[s] the Government's arguments that the defendant committed the crime charged." 517 U.S. at 462. But Sanders instead makes a vague request for evidence related to "law enforcement's investigative methods, the timing of the alleged controlled buys, and the nature and extent of [police] surveillance" to "gauge the 'caliber of the investigation,'" with no explanation of how that evidence would refute the government's case-in-chief. He does not meaningfully challenge his possession of the contraband in his apartment or even the validity of the controlled-buy evidence underpinning the search warrant. Although it is conceivable that in another case investigatory materials, including documents related to a search warrant, could materially help a defendant refute the government's case-in-chief, Sanders has not demonstrated as much here. So we need not explore the full scope of *Armstrong*'s limits on Rule 16 discovery. It is enough to conclude, contrary to the dissenting opinion, that simply asserting that "discovery . . . *could* . . . vitiate[] the government's case" is insufficient to trigger Rule 16's discovery obligations. *See* Dissenting Op. at 58 (emphasis added).

Seeing things otherwise, Sanders returns to Rule 16's use of the term "defense." *See* Fed. R. Crim. P. 16(a)(1)(E)(i) (allowing for disclosure of an "item [that] is material to preparing the defense"). Were we starting from a blank slate, Sanders's reading of the term might carry the day.

After all, in the abstract, a defendant's defense can "take many forms" beyond a "simple response to the Government's case in chief." *See Armstrong*, 517 U.S. at 471–72 (Breyer, J., concurring in part and concurring in judgment). But as a "'middle management' court, we must follow the Supreme Court's precedent." *Knight v. Metro. Gov't of Nashville & Davidson Cnty.*, 67 F.4th 816, 832 (6th Cir. 2023).

Sanders also directs us to the Ninth Circuit's decision in *United States v. Soto-Zuniga*, 837 F.3d 992 (9th Cir. 2016). There, the Ninth Circuit interpreted Rule 16(a)(1)(E)(i) to entitle a defendant to discovery regarding a warrantless car search at a vehicle checkpoint. *Id.* at 1000–02. But the unique circumstances there are worlds apart from Sanders's request. Indeed, *Soto-Zuniga* seemed to align with the general understanding that a defendant may be "entitled to certain discovery" to support a motion to suppress evidence gathered from a warrantless search. *See* 6 LaFave, *supra*, § 11.2(d); *cf. United States v. Thompson*, 16 F. App'x 340, 344 (6th Cir. 2001) (per curiam) (recognizing that an evidentiary hearing may be required to address the propriety of a warrantless search). For that reason, the Ninth Circuit did not grapple with whether Rule 16 limits discovery into the circumstances supporting a search warrant.

2. Sanders also seeks discovery of the case reports for use as "background evidence" at trial to question the investigation's credibility. This argument has its own faults. Chief among them, the requested information is not material to Sanders's defense on the merits.

For Sanders to demonstrate an entitlement to the information sought, he must show that it is "material" to the case he intends to make at trial. *See* Rule 16(a)(1)(E)(i) (allowing disclosure where "the item is material to preparing the defense"). That is, he must establish "that the pre-trial disclosure of the disputed evidence would enable [him] significantly to alter the quantum of proof in . . . [his] favor." 2 Charles Alan Wright et al., *Federal Practice and Procedure* § 254 (4th ed. Apr. 2023 Update); *see also United States v. Lykins*, 428 F. App'x 621, 624 (6th Cir. 2011) (per curiam) (similar); *United States v. Thompson*, 758 F. App'x 398, 405 (6th Cir. 2018) (understanding materiality to mean that the undisclosed information "would exculpate [the defendant] or undermine the government's case against him").

Yet Sanders's arguments as to why these reports would have aided his defense are poorly developed. By and large, he merely speculates that the reports contain information that casts doubt on the validity of the warrant or would otherwise help him "explore" or "discredit" other parts of the investigation. Those "conclusory" assertions are insufficient. *See Harney*, 934 F.3d at 507–08 (explaining that materiality requires "more than conclusory arguments" that the information will help the defense); *see also United States v. Phillip*, 948 F.2d 241, 250–51 (6th Cir. 1991); *United States v. Conder*, 423 F.2d 904, 910 (6th Cir. 1970). Instead, to demonstrate an entitlement to discovery, Sanders needed to address how the additional evidence might show, in a material sense, that he did not possess the guns or narcotics found at the apartment. Put more simply, he must offer "some evidence" as to what discovery might yield. *Harney*, 934 F.3d at 507–08 (citation omitted). His unsubstantiated theories are not enough.

Sanders's most pointed suggestion is that the case reports might clarify his statement to officers at the time of the search that he had "returned to drug trafficking." But why further information on that confession might help fend off the charges at trial is anyone's guess. Sanders's included, it seems, as he does not explain what clarification he hoped to achieve, let alone how it would help his defense. This assertion too falls short of justifying discovery. *See Lykins*, 428 F. App'x at 624.

3. There is yet one more hill Sanders has failed to climb. Even assuming he had a justifiable and material basis for requesting the case reports, Sanders still cannot show that his failure to obtain those materials affected his substantial rights, thereby overcoming the harmless error standard. *See* Fed. R. Crim. P. 52(a) (harmless error); *see also United States v. Clark*, 385 F.3d 609, 619 (6th Cir. 2004) (reviewing Rule 16 challenges under Rule 52(a)). An error would have altered Sanders's substantial rights if it "[a]ffect[ed] the outcome of the district court proceedings." *See United States v. Olano*, 507 U.S. 725, 734 (1993). While the government bears the burden to show an error is harmless, Sanders at the outset must "put the question in issue" by identifying potential ways he was harmed. *See United States v. Johnson*, 837 F. App'x 373, 379 (6th Cir. 2020) (citing *United States v. Montgomery*, 969 F.3d 582, 583 (6th Cir. 2020) (order)); *see also United States v. Jensen*, 608 F.2d 1349, 1357–58 (10th Cir. 1979) (recognizing that although "defendants are often at a disadvantage because they cannot know with certainty what

information the government has," Rule 52(a) prevents reversal of "a conviction on mere speculation that favorable information exists which, if produced [under Rule 16], might conceivably result in an acquittal on the charges.").

Sanders all but forfeits the point. While rather fulsome in suggesting that the discovery denials violated his constitutional rights, Sanders offers little to demonstrate how those denials affected his odds of defeating the prosecution. And it is otherwise hard to imagine how that is so. For instance, even if discovery proved that one officer lied about the surveillance before the second buy, that falsehood, for reasons already discussed, would not be material under *Franks* or otherwise render the warrant affidavit so deficient as to make *Leon* inapplicable. Equally true, the requested investigatory background material is unlikely to be a game changer in Sanders's favor. In practice, background information is "often . . . far more prejudicial to the defendant than useful in determining guilt of the charged offense." *Cf.* 1 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 4:33 (4th ed. Aug. 2023 Update). Nor has Sanders shown otherwise. Considering that officers discovered narcotics and two firearms in Sanders's bedroom, it is difficult to see how background information about the investigation would entirely tilt the playing field in Sanders's favor. *See United States v. Hadley*, 431 F.3d 484, 507 (6th Cir. 2005) (holding that dominion and control over one's own bedroom is sufficient to find constructive possession). All told, the district court did not err in denying Sanders's request for the case reports, nor was any purported error prejudicial.

**B.**

That leaves Sanders's request for supplemental discovery regarding the "drug evidence" related to the controlled buys. Unlike his earlier request, this one proceeds under Rule 16(a)(1)(E)(iii), which affords Sanders access to an "item" that was "obtained from or belongs to the defendant." Assuming that the drug evidence so qualifies, here again Sanders falls short at the harmless error stage. *See Clark*, 385 F.3d at 619 (reviewing an assumed Rule 16 violation for harmless error). As Judge Nalbandian recognized in his panel dissent, Sanders failed to show how his inability to inspect the drugs affected his "substantial rights." *Sanders*, 59 F.4th at 254 n.3 (Nalbandian, J., dissenting). The government's case, recall, rested on the drugs and guns found at the apartment, not items exchanged during the controlled buy. So it is not easy to visualize how

the "outcome of this case would have changed if [Sanders] had inspected" the drugs he sold to the informant. *Id.* Accordingly, any error tied to Sanders's inability to access the drug evidence was harmless.

\* \* \* \* \*

We affirm the judgment of the district court.

———————————

**CONCURRENCE**

———————————

GRIFFIN, Circuit Judge, concurring.

I concur in the judgment, join Section II of the concurrence of Judges Stranch and Bloomekatz, and concur in the remaining portions of the majority opinion except Section III and the "known drug dealers" discussion. I write to explain my objection to Section II.B.2.b, which misstates Fourth Amendment jurisprudence and is acknowledged dicta.

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. "The Amendment was in large part a reaction to the general warrants and warrantless searches that so alienated the colonists and had helped speed the movement for independence." *Chimel v. California*, 395 U.S. 752, 761 (1969); *see also Weeks v. United States*, 232 U.S. 383, 389–91 (1914); *Boyd v. United States*, 116 U.S. 616, 624–30 (1886).

The Fourth Amendment requires probable cause, not just mere suspicion, for a police officer to obtain a search warrant. U.S. Const. amend. IV; *see also Illinois v. Gates*, 462 U.S. 213, 239 (1983); *Brinegar v. United States*, 338 U.S. 160, 175 (1949). The officer's supporting "affidavit must provide the magistrate with a substantial basis for determining the existence of probable cause," i.e., that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

As our en banc court held in *United States v. Carpenter*, "[t]o justify a search, the circumstances must indicate why evidence of illegal activity will be found in a particular place. There must, in other words, be a nexus between the place to be searched and the evidence sought." 360 F.3d 591, 594–95 (6th Cir. 2004) (en banc) (internal quotation marks omitted). Moreover, "it

cannot follow" that, "simply from the existence of probable cause to believe a suspect guilty, that there is also probable cause to search his residence." *United States v. Savoca*, 761 F.2d 292, 297 (6th Cir. 1985) (citation omitted).

Accordingly, a "defendant's status as a drug dealer, standing alone," cannot "give[] rise to a fair probability that drugs will be found in his home." *United States v. Frazier*, 423 F.3d 526, 533 (6th Cir. 2005); *see also United States v. Brown*, 828 F.3d 375, 383 (6th Cir. 2016) ("[W]e have required some reliable evidence connecting the known drug dealer's ongoing criminal activity to the residence; that is, we have required facts showing that the residence had been used in drug trafficking, such as an informant who observed drug deals or drug paraphernalia in or around the residence.").

In the present case, the majority opinion correctly holds that "[t]he controlled buys themselves justified a finding of probable cause." Defendant's actions of leaving the apartment immediately before the buy and promptly returning to it afterward gave credence to the initial tip that he was selling heroin and fentanyl from the apartment. Those facts established probable cause to search the apartment, and that is all we need to resolve this issue.

But the majority opinion goes on a tangent endorsing caselaw finding probable cause to search the homes of "known drug dealers" (whatever that undefined term means) based solely on a purported inference that "evidence is likely to be found where the dealers live." (Quoting with approval *United States v. Davidson*, 936 F.2d 856, 860 (6th Cir. 1991)). I cannot join this aspect of the majority opinion for three reasons.

First, as the majority opinion readily admits, "this is not a known drug dealer case." Simply, there is no occasion to opine on the scope of that caselaw. *See Wright v. Spaulding*, 939 F.3d 695, 701 ("[A] conclusion that does *nothing* to determine the outcome is dictum and has no binding force."). This case is *not* one where the affidavit lacks "facts indicating that the defendant was dealing drugs from his residence," *United States v. McCoy*, 905 F.3d 409, 418 (6th Cir. 2018), so it is not one where we should consult, and unnecessarily endorse, such inapposite caselaw.

Second, the majority opinion suggests that, without any direct or circumstantial evidence connecting a home with criminal activity, a search warrant may be issued because "a judge can infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking." In my view, this is antithetical to our liberties secured by the Fourth Amendment of the Bill of Rights. *See Carpenter*, 360 F.3d at 594–95; *Frazier*, 423 F.3d at 533; *Brown*, 828 F.3d at 383.

The majority's disclaimer that police officers won't "necessarily" have probable cause to search a residence "whenever the home of someone connected to a drug trafficking crime is identified" does little to assuage my concerns. Indeed, that statement lays bare what the majority is doing: suggesting that probable cause to search a home *could* be based solely on the fact that a "known drug dealer" lives there.

Finally, I question the reasonableness of an inference that a person suspected of distributing illegal drugs stores drugs in his home. It is equally plausible that the more successful a drug dealer becomes, the *less* likely he will keep tools of the drug-trafficking trade at his personal residence as a way to avoid detection. *See, e.g.*, *United States v. Rosales*, 990 F.3d 989, 996 (6th Cir. 2021) ("That no typical evidence of drug dealing was found at Rosales' house does not undermine the jury verdict because the government also provided testimony that drug dealers often use stash houses to conceal their activity."); *see also United States v. Taylor*, 85 F.4th 386, 390–91 (6th Cir. 2023) (detailing a drug dealer's storage of kilograms of cocaine and fentanyl at his girlfriend's residence). Indeed, the Sentencing Guidelines provide for an enhancement when a defendant maintains a premises, such as a stash house, "for the purpose of manufacturing or distributing a controlled substance," suggesting that a fair number of defendants maintain drug houses separate from their residences. *See* U.S.S.G. § 2D1.1(b)(12).

For these reasons, I respectfully disagree with, and do not join, the dicta contained in the "known drug dealers" portion of Section II.B.2.b. of the majority opinion. I concur in the judgment, join Section II of the concurrence of Judges Stranch and Bloomekatz, and join the remaining portions of the majority's opinion except Section III.

—————————————

**CONCURRENCE**

—————————————

MATHIS, Circuit Judge, concurring in part and concurring in the judgment. I agree with the dissent that officers with the Lexington Police Department lacked probable cause to search the Yellowstone apartment. And I agree with the majority that the good-faith exception operates to save the search of the apartment. I also agree that the district court did not err in denying Antwone Sanders's motion for supplemental discovery for the reasons stated in Judge Stranch and Judge Bloomekatz's concurrence. I write separately to provide my understanding of why the search warrant affidavit in this case is not a bare-bones affidavit.

**I.**

The key facts related to the suppression issue come from the search warrant affidavit that supported the issuance of the search warrant for the Yellowstone apartment. The affidavit makes three points to suggest that probable cause exists to search the apartment.

*First*, on April 17, 2019, a confidential informant advised Officer Brandon Hazlewood that Sanders was selling "Heroin/Fentanyl" from the Yellowstone apartment. The affidavit does not explain the basis for the confidential informant's statement about Sanders selling drugs from the apartment.

*Second*, at some point between April 10 and April 24, Officer Hazlewood monitored a controlled buy between Sanders and a confidential informant at an unspecified location. After the controlled buy, Sanders drove directly to the Yellowstone apartment.

*Third*, sometime between April 22 and April 24, officers monitored another controlled buy between Sanders and a confidential informant. Officers observed Sanders exit the Yellowstone apartment, get in his vehicle, and drive directly to the "pre-determined meet location" to participate in the controlled buy. Sanders then returned directly to the apartment.

The affidavit mentions nothing about the credibility, reliability, or veracity of the confidential informant(s).  But based on the information it did contain, Officer Hazlewood sought a warrant to search the Yellowstone apartment for drugs, drug paraphernalia, cellphones, and any other property that would indicate that Sanders sold drugs.

## II.

The Fourth Amendment guarantees the "right of the people to be secure in their . . . houses" against "unreasonable searches and seizures."  U.S. Const. amend. IV.  It also requires law enforcement officers to have "probable cause" to obtain a search warrant.  *Id.*  The exclusionary rule gives teeth to the amendment by prohibiting the government from using evidence procured in violation of the Fourth Amendment at trial.  *Herring v. United States*, 555 U.S. 135, 139 (2009).  The Supreme Court has explained that "the exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence."  *Id.* at 144.

Many times, there are exceptions to the rules.  In *Leon*, the Supreme Court held that the exclusionary rule does not apply to evidence seized in good faith by law enforcement even if probable cause did not support the search.  468 U.S. at 922 (concluding "that the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion").  Thus, "[t]he good-faith exception is a judicially created exception to th[e] judicially created" exclusionary rule.  *Davis v. United States*, 564 U.S. 229, 248 (2011).  The good-faith exception applies when officers "act with an objectively reasonable good-faith belief that their conduct is lawful" or their conduct amounts to "isolated negligence."  *Id.* at 238 (internal quotation marks omitted).

Sometimes there are exceptions to the exceptions.  As we have said, an officer cannot rely on a "subsequently invalidated search warrant" in the following four circumstances:

> (1) the magistrate was misled by information in the affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) the magistrate abandoned his judicial role or neutrality; (3) the warrant was so lacking in indicia of probable cause as to render official belief in its

existence unreasonable; or (4) the warrant was so facially deficient that it could not reasonably be presumed valid.

*United States v. Helton*, 35 F.4th 511, 521 (6th Cir. 2022) (internal quotation marks omitted).

I address the applicability of the third circumstance. A warrant so lacking in indicia of probable cause is considered a bare-bones affidavit. As a recent decision of our en banc court noted, a bare-bones affidavit "merely states suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *United States v. Christian*, 925 F.3d 305, 312 (6th Cir. 2019) (en banc) (internal quotation marks omitted). With a bare-bones affidavit, a reasonable officer would view the affidavit as "woefully deficient" at establishing probable cause. *Id.* In determining whether an affidavit is bare bones, courts look at the affidavit "holistically" and consider "the totality of the circumstances." *United States v. Ward*, 967 F.3d 550, 554 (6th Cir. 2020).

Just because a search warrant affidavit lacks probable cause does not mean that it is bare bones. *United States v. White*, 874 F.3d 490, 497 (6th Cir. 2017). "[T]o avoid the bare-bones designation," the search warrant affidavit must "establish a 'minimally sufficient nexus between the illegal activity and the place to be searched.'" *Christian*, 925 F.3d at 313 (quoting *United States v. Brown*, 828 F.3d 375, 385 (6th Cir. 2016)). This does not require a heavy lift—the affidavit must show "some connection . . . between the criminal activity at issue and the place to be searched." *United States v. Reed*, 993 F.3d 441, 451 (6th Cir. 2021) (quoting *United States v. McCoy*, 905 F.3d 409, 416 (6th Cir. 2018)). This is "a less demanding showing than the substantial basis threshold required to prove the existence of probable cause." *Helton*, 35 F.4th at 522 (internal quotation marks omitted).

The search warrant affidavit in this case is not bare bones. It provides a connection between Sanders's drug trafficking and the Yellowstone apartment. Specifically, the affidavit indicates that between April 22 and April 24, 2019, officers observed Sanders leave the apartment, drive to a location to participate in the controlled buy with a confidential informant, and then return to the apartment. And the affidavit identifies another controlled buy with a confidential informant where Sanders travelled directly to the buy from the apartment and then returned directly to the apartment.

Thus, although the affidavit failed to establish probable cause for the search, the officers executing the search warrant acted in good faith when they relied on it.

———————————

**CONCURRENCE**

———————————

JANE B. STRANCH and RACHEL S. BLOOMEKATZ, Circuit Judges, concurring in the judgment.

I.

This case mainly presents a Fourth Amendment question about the legality of the search of an apartment. The good-faith exception to the warrant requirement saves the fruits of the search from suppression. *See United States v. Leon*, 468 U.S. 897, 922 (1984). We join Sections I and II of Judge Mathis's concurrence explaining why the warrant here did not rest on a bare bones affidavit, and we agree with the majority that Antwone Sanders was not entitled to a hearing to show that the affidavit contained false information because he did not satisfy *Franks*'s materiality requirement. *See Franks v. Delaware*, 438 U.S. 154, 171–72 (1978). These narrow grounds resolve the Fourth Amendment question without requiring us to address probable cause, so we don't. *See United States v. Ardd*, 911 F.3d 348, 351 (6th Cir. 2018) (we need not decide the probable cause question when the good-faith exception applies). We write separately to address the Rule 16 question as to the investigatory materials Sanders requested.

II.

We join the majority in concluding that Antwone Sanders was not entitled to the requested discovery under Federal Rule of Criminal Procedure 16(a)(1)(E). As the majority concludes, "simply asserting that 'discovery . . . *could* . . . vitiate[] the government's case' is insufficient to trigger Rule 16's discovery obligations." Maj. Op. at 23 (quoting Dissenting Op. at 58). Sanders was required to show that the evidence he requested "could materially help" him "refute the government's case-in-chief," and he "has not demonstrated as much here." *Id.* That conclusion resolves the Rule 16 issue and renders the majority's discussion of Rule 16(a)(2) and harmless error unnecessary.

Prior to pleading guilty, Sanders moved to suppress the evidence found in the Lexington, Kentucky apartment at issue in this case. A magistrate judge authorized a search of that apartment after reviewing an affidavit signed by a police officer who attested that other police personnel had observed Sanders traveling to and from the apartment in connection with two drugs sales. Sanders sought discovery that he believed would undermine the affidavit's validity by showing that one detective involved in the surveillance lied. In support, he proffered only general statements from other officers in a different case questioning that detective's "ethic[s]." Appellant's Br. 9. The government refused to disclose the evidence he requested, and the district court denied Sanders's motion to compel discovery.

Under Rule 16(a)(1)(E), the government "must" disclose certain documents and items that are "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). The scope of discovery under this provision, therefore, depends on the meaning of "material" and "defense" in this context.

First, "material." As the majority opinion recognizes, for the discovery to be "material" to the defense, there must be some "preliminary showing," *United States v. Armstrong*, 517 U.S. 456, 473 (1996) (Breyer, J., concurring), that it could "significantly [] alter the quantum of proof" in the defendant's favor, Maj. Op. at 24 (quoting 2 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 254 (4th ed.)). That is indeed the consensus among our sister circuits.[1] Next, "defense." *Armstrong* defined "defense" for Rule 16 purposes—albeit in a different context—to mean the "defendant's response to the Government's case in chief." 517 U.S. at 462. Combining these definitions, an evidentiary item is "material to preparing the defense" when the defendant makes a "preliminary showing" that the discovery could "significantly [] alter the

---

[1]Although "[m]ateriality under Rule 16 has not been authoritatively defined in this Circuit," *United States v. Lykins*, 428 F. App'x 621, 624 (6th Cir. 2011) (per curiam), it has been uniformly defined in other circuits. *See United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993) (quoting *United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991)) ("[T]here must be some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor."); *United States v. Caro*, 597 F.3d 608, 621 (4th Cir. 2010); *United States v. Buckley*, 586 F.2d 498, 506 (5th Cir. 1978); *United States v. Baker*, 453 F.3d 419, 425 (7th Cir. 2006); *United States v. Marshall*, 532 F.2d 1279, 1285 (9th Cir. 1976); *United States v. Cates*, 73 F.4th 795, 812 (10th Cir. 2023); *United States v. Jordan*, 316 F.3d 1215, 1251 (11th Cir. 2003); *United States v. Marshall*, 132 F.3d 63, 68 (D.C. Cir. 1998); *see also United States v. Soto-Zuniga*, 837 F.3d 992, 1003 (9th Cir. 2016) (quoting *United States v. Hernandez-Meza*, 720 F.3d 760, 768 (9th Cir. 2013)) ("Materiality is a 'low threshold; it is satisfied so long as the information . . . would have helped' to prepare a defense.").

quantum of proof" in the defendant's favor with respect to their "defense against the Government's case in chief."

We echo the majority's conclusion that "in another case," the requested "investigatory materials, including documents related to a search warrant," could meet this standard. Maj. Op. at 23. But Sanders has not met it here because he has not made a preliminary showing that the materials he requested would undermine the veracity of the search warrant, leading to the suppression of evidence the government might use in its case in chief. As the majority analyzes in Section II.C.2, the district court found that multiple officers observed the same conduct as the purportedly unethical detective, so any potential "taint" on the investigation makes little difference. Maj. Op. at 20. Sanders does not even suggest that the other officers who witnessed the same trips to and from the controlled buys were unethical, that there is any basis for doubting their observations, or any other reason to question the officers' recounting of the controlled buys. Thus, his conclusory allegations that such discovery would be material to his defense fall flat.

Based on this reasoning, the majority's additional Rule 16 analysis is unnecessary. As the majority and dissenting opinions reflect, our court's en banc review is focused on Fourth Amendment questions; indeed, the panel majority did not even discuss Rule 16 and the panel dissent only did so in a footnote. *United States v. Sanders*, 59 F.4th 232, 254 n.3 (6th Cir. 2023) (Nalbandian, J., dissenting). Therefore, we would not speculate, as the majority here does, as to whether the requested material counts as a discoverable "report" under Rule 16(a)(2), and how to reconcile that provision with Rule 16(a)(1)(E). Maj. Op. at 21–22. The government does not even argue as much.

Nor would we speculate that if there were a discovery error, that it was "harmless." Maj. Op. at 25–26. Because the government never disclosed the requested material (even in camera to the court), we do not know the contents of such discovery. It could have revealed errors or evidence unrelated to the purportedly unethical officer. To be sure, Sanders was not entitled to the requested documents because he did not make the preliminary showing of materiality needed to open the door to Rule 16(a)(1)(E)(i) discovery. But that failure tells us nothing about the impact the undisclosed materials might have had on the case. We are aware of no other contexts in which our court deems harmless the failure to disclose, introduce, or admit evidence while blind to its

contents.  The majority cites none.  The majority's citation to *United States v. Clark* is inapposite because there the requested evidence was disclosed at trial, so the defendant, the district court, and our court all knew what it contained. 385 F.3d 609, 619–20 (6th Cir. 2004).  By dismissing this alleged error as harmless, the majority overlooks the infamous dilemma "posed by Chief Justice Marshall more than two centuries ago: 'Now, if a paper be in possession of the opposite party, what statement of its contents or applicability can be expected from the person who claims its production, he not precisely knowing its contents?'"  Wright & Miller, *supra*, § 254 (quoting *United States v. Burr*, 25 F. Cas. 187, 191, No. 14,694 (Cir. Ct. Dist. Va. 1807)).  Chief Justice Marshall raised this concern with requiring a preliminary showing to obtain discovery; its cautionary message applies with even more force when we are evaluating harmlessness.

These discussions are unnecessary.  We would decide the Rule 16 question only on materiality as described above.

———————

**DISSENT**

———————

CLAY, Circuit Judge, dissenting. Law enforcement twice watched Antwone Sanders conduct a drug deal out of a car, drive some distance from the drug deal to an apartment building, and then enter a residence. On this evidence alone, the state magistrate issued a warrant to search the residence, which law enforcement executed, despite this paltry surveillance hardly reaching— let alone clearing—the constitutional requirement of probable cause. Our precedent has never condoned such a poor excuse for probable cause, particularly when the sanctity of the home is at issue. Yet the majority and concurrences sanction the search of any home—even one with no other ostensible connection to a suspect—so long as a person suspected of a crime merely enters it following a drug buy. Because the Fourth Amendment demands more, I respectfully dissent.

**I. Probable Cause**

The Constitution requires warrants to be supported by probable cause, mandating that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. This command is no mere formality. Rather, it is the very bulwark between citizens and an overzealous, capricious government power. The use of illegally seized evidence amounts to "a denial of the constitutional rights of the accused." *Mapp v. Ohio*, 367 U.S. 643, 648 (1961) (citation omitted). As a result, courts have imposed the exclusionary rule as a "deterrent safeguard without insistence upon which the Fourth Amendment would have been reduced to a form of words." *Id.* (citation omitted). The probable cause requirement "seek[s] to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime . . . . To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." *Brinegar v. United States*, 338 U.S. 160, 176 (1949). And it is courts like ours that must identify, condemn, and remedy a Fourth Amendment violation when it occurs.

To do so, we look to whether there existed "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion that there is a fair probability that

contraband or evidence of a crime will be found in a particular place." *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (cleaned up). Affidavits prepared by officers seeking a warrant must show a likelihood of two things: "first, that the items sought are 'seizable by virtue of being connected with criminal activity'; and second, 'that the items will be found in the place to be searched.'" *United States v. Church*, 823 F.3d 351, 355 (6th Cir. 2016) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 555 n.6 (1978)). In other words, the Fourth Amendment requires a "nexus between the place to be searched and the evidence sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (citation omitted). And this connection between the residence and the evidence of criminal activity must be specific and concrete, not "vague" or "generalized." *Id*. at 595. Further, when an affidavit contains hearsay information from a confidential informant, we consider whether the affidavit sets out the "(1) veracity; (2) reliability; and (3) basis of knowledge" of the informant's tip. *United States v. Gunter*, 551 F.3d 472, 479 (6th Cir. 2009).

Based on these familiar, constitutionally required background principles, the police lacked probable cause here. The affidavit included precious few facts that support a nexus between the drug evidence that the officers sought and the Yellowstone Parkway apartment that the officers searched. The affiant stated that he received a tip from a confidential informant (the "CI") that "[Defendant] was selling Heroin/Fentanyl from [the Yellowstone Parkway apartment]." Aff., R. 25-3, Page ID #159. Next, pertaining to the first controlled purchase, officers observed Sanders drive from the controlled purchase location to the Yellowstone Parkway apartment. Finally, pertaining to the second controlled purchase, officers observed Sanders exit the apartment and drive to the controlled purchase location, and then drive back from that location to the apartment, which Sanders then entered. Officer Hazlewood then submitted an affidavit stating these scant facts to the state court magistrate, who issued a warrant.

Our case law demonstrates that these facts alone are insufficient to support probable cause. In two similar cases, *United States v. Higgins*, 557 F.3d 381, 390 (6th Cir. 2009), and *United States v. Brown*, 828 F.3d 375, 383 (6th Cir. 2016), this Court determined there was an insufficient nexus between criminal activity and the place to be searched to support the search warrant. In *Higgins*, an informant identified the defendant's residence as the site of a drug operation. 557 F.3d at 385.

However, the police did not establish the informant's reliability, and the affidavit did not "assert that the informant had been inside [the defendant's] apartment, that he had ever seen drugs or other evidence inside [the defendant's] apartment," or that "the informant had seen drugs or other evidence in or around [the defendant's] apartment." *Id*. at 390. Similarly, in *Brown*, although the defendant's car was registered to the defendant's residence and tested positive for narcotics during a canine search, the affidavit did not suggest that "a reliable confidential informant had purchased drugs" at the defendant's residence or that "the police had ever conducted surveillance" there. 828 F.3d at 382–83.

*Brown* and *Higgins* control this case. Like the affidavits in those cases, Officer Hazlewood's affidavit contains an insufficient nexus to support the search warrant. The informant's tip is the lone connection between Sanders' drug activity outside the Yellowstone Parkway apartment and purported drug activity inside, and like the affidavit in *Higgins*, the tip contained no statement that the informant had personally bought drugs in the apartment from Sanders. Further, Officer Hazlewood did not state that he relied on or worked with the informant on prior occasions, or that the informant had proved reliable in the past. Crucially, he did not assert any belief concerning the reliability or veracity of the informant's tip, let alone provide any factual basis by which the issuing magistrate could assess its reliability or veracity. *See United States v. Helton*, 314 F.3d 812, 822 (6th Cir. 2003) (explaining that, under Sixth Circuit precedent, an affidavit "must contain a statement about some of the underlying circumstances indicating the informant was credible or that his information was reliable" (citation omitted)); *see also Higgins*, 557 F.3d at 389–90 (finding insufficient nexus where the affidavit did not attest to the informant's reliability, even though the informant was known to the affiant and the issuing magistrate). Even had Officer Hazlewood asserted that the informant was reliable, his statement must be coupled with supporting evidence, as "[c]ourts do not accept an affiant's unsupported assertion that an informant is reliable." *United States v. Helton*, 35 F.4th 511, 519 (6th Cir. 2022) (citation omitted).

Further, the affidavit fails to set forth the informant's basis of knowledge, *i.e.*, "the particular means by which an informant obtained his information." *United States v. Smith*, 182 F.3d 473, 477 (6th Cir. 1999) (citing *Illinois v. Gates*, 462 U.S. 213, 228 (1983)). Instead, the affidavit baldly states that the "affiant received information from a Confidential Informant (CI)

that a subject by the name of Antwone Sanders was selling Heroin/Fentanyl from 2852 Yellowstone Parkway Apartment D, Lexington, KY 40517." Aff., R. 25-3, Page ID #159. This statement does nothing to establish the basis of knowledge of the informant, such as indicating that the informant purchased drugs at the Yellowstone Parkway apartment or observed drugs within the apartment. *See Helton*, 314 F.3d at 822 ("[A] tip [that] was sparse in relevant detail . . . loses persuasive value."). Without any showing of the informant's reliability, and without any statement of firsthand knowledge about the alleged criminal activity at the apartment, the informant's tip carries little weight in the probable cause analysis. *Id.* at 821–22; *Higgins*, 557 F.3d at 390.

Nonetheless, an affidavit that fails to establish an informant's reliability, veracity, and basis of knowledge might "support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information." *United States v. Woosley*, 361 F.3d 924, 927 (6th Cir. 2004) (citation omitted). In other words, "[w]hat an informant and her tip lack in intrinsic indicia of credibility, however, police must make up for in corroboration." *United States v. Howard*, 632 F. App'x 795, 804 (6th Cir. 2015) (citation omitted). But the corroboration in this case was as deficient as the tip itself. The primary piece of purportedly corroborating evidence is the officers' surveillance of Sanders' one-and-a-half trips between the controlled purchase locations and the Yellowstone Parkway apartment. However, Sanders' entering and exiting of an apartment, alone, provides no indication of criminal activity within the apartment. In fact, it suggests the opposite: that Sanders sought to keep his criminal activity and the Yellowstone Parkway apartment separate, contrary to what the CI reported. And officers' observation of two controlled buys—both of which were a driving distance *away* from the apartment—actually undermines the informant's claim that drug activity occurred in the apartment. The indolent lack of corroboration in this case is all the more condemnable when one considers how easy it would have been to properly verify this tip. *See Helton*, 35 F.4th at 520 ("We have warned that one of the dangers of law enforcement's 'failure to corroborate all that can be easily corroborated' is that 'a warrant will not issue where it should.'" (quoting *United States v. Allen*, 211 F.3d 970, 987 (6th Cir. 2000) (en banc))).

The tip was therefore uncorroborated and did not have the required reliability, veracity, or basis of knowledge in order to support a finding of probable cause. Without any of those elements

and without corroboration, the information in the affidavit fell well short of the constitutional minimum. The majority disregards this well-settled precedent to state that none of the omissions in the tip "come close to being fatal" because "the tip was not a vital component of the probable cause equation." Maj. Op. at 9. But the majority's misapprehension of what we require of an informant's tip exposes its misunderstanding of the totality of the circumstances analysis. *See Gates*, 462 U.S. at 233 ("Instead, [veracity and basis of knowledge] are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability."). And the majority's own cited support disproves its claim that neither corroboration nor reliability nor the informant's basis of knowledge are required for the tip to confer probable cause. In each of the majority's cited cases, other indicia of reliability made up for an issue with the tip. *See, e.g.*, *United States v. Hines*, 885 F.3d 919, 925 (6th Cir. 2018) ("So even though the affidavit did not address in detail the reliability of CS1 and CS2, it gave appreciable attention to the bases of their knowledge."). But in this case, we have no reason to credit the tip. Given the totality of the circumstances analysis, if a tip is wanting on all of these fronts, as the instant one was, it should not be used.

The evidence presented to the issuing magistrate whittles down to Sanders' movements over a few hours on two particular days and an unreliable tip. Even considered together, these facts did not establish a nexus between the alleged criminal activity and the residence. *See District of Columbia v. Wesby*, 583 U.S. 48, 56–60 (2018) (analyzing probable cause based on the totality of the circumstances). Thus, probable cause did not exist, and the issuing magistrate had no "substantial basis" for concluding that it did. *Gates*, 462 U.S. at 236.

The majority does not persuade otherwise. First, the majority cites several cases that involve significantly *more* indicia of probable cause than found in this case. Maj. Op. at 6. Many of those cases, unlike this case, involved a credible, detailed tip from one or more informants who either observed or engaged in drug activity in the residence to be searched. *See, e.g.*, *Hines*, 885 F.3d at 922 (two informants had personal knowledge of the defendant storing drugs at the residence to be searched); *United States v. Moore*, 661 F.3d 309, 311–12 (6th Cir. 2011) (informant had

observed the defendant "storing and selling cocaine" at the residence); *United States v. Dyer*, 580 F.3d 386, 388 n.1 (6th Cir. 2009) (informant had observed the defendant engaging in a drug deal and the storage of a large amount of drugs at residence). By contrast, the unidentified, unverified informant in the instant case stated that Sanders was dealing from the Yellowstone Parkway apartment, but provided no specific statements that he or she had personally seen drugs in the apartment or had bought drugs there. In fact, the informant's statement lacks any modicum of evidence that the informant was ever in the apartment, given its vagueness and law enforcement's contrary observations. Because the panels in *Hines*, *Moore*, and *Dyer* found the informants' detailed, first-hand statements to provide the basis of knowledge necessary to create the fair probability that the drugs would be found in the residence, *see Hines*, 885 F.3d at 924; *Moore*, 661 F.3d at 312; *Dyer*, 580 F.3d at 392, the noticeably absent information in the instant case is easily distinguishable.

The majority then cites cases that involve what the majority deems "circumstantial evidence." Maj Op. at 7. Conveniently, however, none of the "circumstantial evidence" that the majority highlights in those cases exists here. Law enforcement did not establish that Sanders resided at the Yellowstone Parkway apartment, so officers had no grounds to believe that Sanders might store evidence there. *See United States v. Williams*, 544 F.3d 683, 685 (6th Cir. 2008); *United States v. Elbe*, 774 F.3d 885, 887 (6th Cir. 2014); *United States v. Carney*, 675 F.3d 1007, 1012 (6th Cir. 2012); *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006). Without that key detail, law enforcement cannot rely on the inference that this Court has sometimes invoked when accompanied by additional indicia of probable cause: that evidence is likely to be found in drug dealers' homes. Any holdings that rely in part on the crucial fact that the defendant lived at the residence to be searched therefore have no bearing on this case.

By the same token, the majority admits that "this is not a known drug dealer case," so its aside concerning such cases, which likewise require that law enforcement establish that a residence belongs to a defendant, is both gratuitous and inapplicable. Maj. Op. at 12. Even setting to one side the majority's failure to define who is a "known drug dealer," we "have never held . . . that a suspect's status as a drug dealer, standing alone, gives rise to a fair probability that drugs will be found in his home." *Brown*, 828 F.3d at 383 (citation omitted). Instead, our precedent requires

"facts showing that the residence had been used in drug trafficking," such as an affiant attesting to personal observations of drug deals or drug paraphernalia in the residence. *Id.* The majority therefore far exceeds the bounds of our existing precedent by implying in dicta that a showing that a residence belongs to a "known drug dealer"—which the majority conveniently does not define— may be enough on its own to satisfy probable case. Maj. Op. at 12. But our case law has never so flagrantly disregarded the Fourth Amendment, which requires a showing over and above the mere fact that a person is suspected of wrongdoing to search their home. *See Brown*, 828 F.3d at 383. More damning, the facts of this case do not require such a statement. No informant stated that he or she had personally bought drugs in the apartment, and no affiant stated that Sanders resided at the Yellowstone Parkway apartment. While such evidence is neither a necessary nor sufficient condition for probable cause to believe drug activity occurred inside the home, the utter lack of such evidence here renders the majority's reliance on "known drug dealer" case law inapposite, and makes the dearth of probable cause all the more apparent.

In pointing out the inapplicability of the majority's tangent regarding "known drug dealer" cases, this opinion does not, as the majority alleges, assert a categorical rule by which all warrant affidavits must claim that a defendant lives in a particular residence. The only categorical rule we urge today is that demanded by the Fourth Amendment: "[t]o justify a search, the circumstances must indicate why evidence of illegal activity will be found in a particular place." *Carpenter*, 360 F.3d at 594. A showing that a defendant lives in a particular residence is one of many details that could appear in an affidavit that might contribute to a nexus between the criminal activity and the place to be searched, and one of many details that was lacking in this case. That a defendant lives in the residence to be searched is therefore no panacea for probable cause, as the majority's tangent appears to suggest. This opinion points out the affidavit's failure to establish that this was Sanders' residence only to underscore that law enforcement was not entitled to any favorable inference that might accompany such a showing.

Perhaps in recognition of the inapplicability of the "known drug dealer" cases, the majority points to several cases that upheld searches where officers observed a person leave or return to a location before or after a sale of contraband—implying that, because a similar chain of events happened in this case, the search of the apartment was legal. Maj. Op. at 6 (citing *United States v.*

*White*, 990 F.3d 488, 490 (6th Cir. 2021); *United States v. Christian*, 925 F.3d 305, 310 (6th Cir. 2019); *United States v. Crawford*, 943 F.3d 297, 309 (6th Cir. 2019); *United States v. Ellison*, 632 F.3d 347, 349 (6th Cir. 2011)). But, again, the majority reaches for inapposite cases with significantly more indicia of probability than the meager affidavit in this case to bless a search the Fourth Amendment cannot tolerate. In *White*, one of the drug sales occurred in the searched residence, which was the defendant's home. 990 F.3d at 489–90. In *Christian*, multiple informants claimed to have purchased drugs several times from the defendant in the defendant's residence. 925 F.3d at 309. In *Ellison*, the police witnessed a suspect leave what police knew to be his apartment, participate in a drug transaction directly outside the apartment, and then immediately return to the apartment. 632 F.3d 347, 349 (6th Cir. 2011). And in *Crawford,* not only did officers thoroughly corroborate the tip, unlike in this case, but the affidavit included additional information that the informant "told officers that Crawford kept his supply of cocaine in a duffle bag— something officers observed right before the controlled buy when Crawford left his apartment carrying a duffle bag." 943 F.3d at 302, 309.

The majority waves away these important factual distinctions, boldly claiming that "none of those cases hinged on" particular facts. Maj. Op. at 13. But each of these cases found probable cause precisely *because* of particular facts that are missing in this case. Indeed, there is a clear common thread throughout our case law to which the majority conveniently turns a blind eye. By generalizing cases that are composed of specific facts noticeably absent from this appeal, the majority claims that we have previously held that merely returning to a location after a drug buy provides a sufficient nexus, satisfying the probable cause inquiry. Not so. Crucially, every single one of the majority's cited cases involved a more substantial connection between the defendant and the place to be searched, a plainer tie between the location and criminal activity, or a reliable tip that an informant bought drugs at the residence in question. Comparing such facts to the instant case makes the majority's arguments unconvincing at best and outright misleading at worst, and further supports the conclusion that probable cause was lacking in this case.

The majority claims that arguments to the contrary employ a "hypertechnical" approach that focuses too much on what an affidavit "lacks" rather than what "good qualities it contains." Maj. Op at 7. But we consistently consider what an affidavit lacks—often by way of comparison

to prior affidavits and decisions—to determine whether an affidavit contains sufficient indicia of probable cause. *See, e.g.*, *Helton*, 35 F.4th at 519 ("[T]he affidavit lacks the necessary indicia of both veracity and reliability for the [confidential informant's] tips."); *United States v. Waide*, 60 F.4th 327, 336 (6th Cir. 2023) ("The affidavit lacks any additional information that might support either source's credibility."); *United States v. McPhearson*, 469 F.3d 518, 527 (6th Cir. 2006) (finding the affidavit in question "so lacking in indicia of probable cause"); *United States v. Rose*, 714 F.3d 362, 367 (6th Cir. 2013) (evaluating whether an affidavit "lack[ed] probable cause"); *Brown*, 828 F.3d at 382 ("[T]he search warrant affidavit contained no evidence that Brown distributed narcotics from his home, that he used it to store narcotics, or that any suspicious activity had taken place there."); *United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005) ("The warrant in this case failed to make any connection between the residence to be searched and the facts of criminal activity that the officer set out in his affidavit."). Rather than award a gold star to an affidavit's "good qualities," it is this Court's prerogative, if not our sworn duty, to consider whether an affidavit lacks probable cause in order to determine compliance with the Fourth Amendment. A thorough review of what the affidavit lacks—particularly if what it lacks is the very probable cause that the Constitution requires—is necessary to carry out our judicial role.

The majority further errs in speculating that "it was fair for officers to assume . . . that the proceeds [of the controlled buys] were taken into the apartment." Maj. Op. at 8. The nexus requirement demands more than what it is "fair to assume." *See Laughton*, 409 F.3d at 747 (no nexus between criminal activity and place to be searched where affidavit averred only that a CI claimed there were drug stashes in the residence); *Carpenter*, 360 F.3d at 594 (affidavit that described marijuana field near house to be searched "fall[s] short of establishing required the nexus"); *United States v. Van Shutters*, 163 F.3d 331,336–38 (6th Cir. 1998) (no probable cause where warrant affidavit failed to state a nexus between the place to be searched and the criminal activity); *Schultz*, 14 F.3d at 1097 (no probable cause for warrant where affidavit lacked an "evidentiary nexus . . . between the [place to be searched] and the criminal activity"). Simply relying on assumptions, rather than *facts*, in the probable cause context swallows the totality of the circumstances rule altogether. For example, one could assume just as easily that Sanders stored drug paraphernalia or proceeds in his car, or that he intentionally did not store such incriminating items in the apartment, given law enforcement's observations.

But such concerns are of no moment to the majority, which fills in the glaring holes in the affidavit through post-hoc rationalization. And the majority's lackadaisical analysis would allow governmental intrusion into *any* home that a suspected drug dealer happened to enter following an alleged drug sale. This consequence vastly outstrips the bounds of our precedent. As already stated, this Court has not upheld a similar warrant so lacking in allegations of criminal activity to be found at the place to be searched. Further, the majority's new regime nullifies the distinction between probable cause to arrest a suspect for alleged wrongdoing and the showing required for police to cross the threshold of the home, rendering the homes of friends and family vulnerable to the whims of law enforcement once a suspected criminal enters the home.

Readers should therefore not be misled by the majority's profession that it is simply applying existing law to an uncomplicated and unproblematic search. To the contrary, the majority is actually manipulating our precedent to rubberstamp a deficient warrant. Such a holding violates the well-established principle that a search warrant application must show more than that a person connected with a property is suspected of a crime, *Zurcher*, 436 U.S. at 556, and renders the Fourth Amendment's warrant requirement "an inconsequential formality and a mere form of words." *Allen*, 211 F.3d at 987 (Clay, J., dissenting) (internal quotation marks and citation omitted). When presented with similar factual circumstances, this Court has rightfully reversed the denial of a motion to suppress. The majority therefore erodes the protections of the Fourth Amendment under the dubious contention of purported application of existing law. Because selectively quoting from inapposite case law to effectively nullify a vital constitutional protection does not change the fact that no probable cause existed to support this search, I would have reversed the district court's denial of Sanders' motion to suppress.

## II.  The Good Faith Exception

The majority, after erroneously concluding that the search was supported by probable cause, still perplexingly conducts a similarly flawed good faith exception analysis, despite the fact that this Court should reach the good faith exception only after concluding that the warrant in question was *not* supported by probable cause. *See, e.g.*, *United States v. Pinson*, 321 F.3d 558, 565 (6th Cir. 2003) ("Because we find that the warrant was issued upon probable cause, we need not decide whether the good-faith exception . . . applies."); *United States v. Reed*, 993 F.3d 441,

451 (6th Cir. 2021) ("*Leon*'s exception applies only when an affidavit falls short of probable cause."). The majority's probable cause conclusion should have precluded it from ever reaching the good faith exception inquiry.[2] Aside from unnecessarily reaching this question, the majority arrives at the wrong answer. This search cannot be saved by the "good faith" exception to the exclusionary rule announced in *United States v. Leon*, 468 U.S. 897 (1984).

In *Leon*, the Supreme Court held that the Fourth Amendment exclusionary rule does not apply when police officers rely in good faith on a warrant that is ultimately determined to lack probable cause. *Id.* at 913. In determining whether police acted in good faith, the "inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Id.* at 922 n.23. To aid courts in resolving this question, *Leon* outlined four circumstances in which an officer's reliance would not be objectively reasonable: (1) when the affidavit supporting the search warrant contains information "that the affiant knows (or is reckless in not knowing) contains false information;" (2) when the magistrate who issued the search warrant abandoned his or her "neutral and detached role;" (3) "when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable;" or (4) "when the warrant is so facially deficient that it cannot reasonably be presumed to be valid." *Laughton*, 409 F.3d at 748 (citing *Leon*, 468 U.S. at 914–23).

At issue in this case is the third limitation on the good faith exception, which may be triggered by a "bare bones" affidavit. *Id.* A bare bones affidavit is one that merely "states only 'suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge.'" *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (quoting *Laughton*, 409 F.3d at 748). In contrast, an affidavit is not bare bones

---

[2]The majority's approach is legally incorrect. The good faith exception is available only in the absence of probable cause. *Reed*, 993 F.3d at 451. The judges who join the concurrence by Judges Stranch and Bloomekatz make a similar mistake in concluding that the good faith exception can apply without first performing the probable cause analysis and determining that probable cause is lacking as required by law. *See Leon*, 468 U.S. at 907 (establishing the good faith exception to rescue "tangible evidence obtained in reliance on a search warrant issued by a detached and neutral magistrate *that ultimately is found to be defective*." (emphasis added)). A contrary approach that never determines whether the warrant is defective is not only legally unsound, but it also stymies the development of our probable cause jurisprudence, a disservice to lower courts and parties alike.

if it "contain[s] a minimally sufficient nexus between the illegal activity and the place to be searched." *See Carpenter*, 360 F.3d at 596. For the exception to apply, "the officer's reliance on the magistrate's probable-cause determination . . . must be objectively reasonable." *Leon*, 468 U.S. at 922.

Even acknowledging the modest bar for warrants to be salvaged under the good faith exception, the evidence in this case was not enough to provide the "modicum of evidence" required between the criminal activity at issue and the place to be searched. *Reed*, 993 F.3d at 451 (citation omitted). The good faith exception requires some "underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *White*, 874 F.3d at 496. The mere observation of Sanders entering a home after a drug deal—along with a deficient tip—is insufficient. As discussed, Officer Hazlewood's affidavit gave no indication of the veracity or reliability of the information obtained from the informant, or the factual basis underlying the informant's knowledge. *Cf. Higgins*, 557 F.3d at 385, 391 (applying the good faith exception to a search of defendant's home address where the informant told the officers that he had personally purchased drugs from the defendant at the defendant's address earlier the same day, and the tip was corroborated in multiple ways). As a result, Officer Hazlewood's reliance on a deficient tip cannot be deemed reasonable.

The majority does not just err in reaching the opposite conclusion. Even worse, the majority applies a lower standard for the good faith exception than that established by our or Supreme Court precedent. Instead of properly analyzing whether the officer's reliance on the warrant in question was reasonable, the majority would require the officers to be on "clear notice that Hazlewood's affidavit was so deficient that they acted deliberately, recklessly, or grossly negligent in not second-guessing the judge's decision." Maj. Op. at 16. But rather than excuse all misconduct absent "clear notice," the good faith exception inquiry "is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n.23. And if an affidavit fails to "provid[e] some underlying factual circumstances regarding veracity, reliability, and basis of knowledge," then an officer's reliance will not be deemed reasonable. *White*, 874 F.3d at 496.

When viewed under these correct standards, it is clear that no reasonable officer would have relied on this deficient warrant.

First, because a reasonable officer would know that the informant's tip should be given little weight, if any, due to its minimal trustworthiness and reliability, no reasonable officer would believe that the affidavit established probable cause to search the Yellowstone Parkway apartment. *Helton*, 314 F.3d at 821–822, 824 (concluding that an unreliable informant's tips "do not merit much weight in the probable cause determination" and finding the informant's tip too defective to apply the good faith exception). "[A]t a minimum, a reasonable officer would have sought to corroborate [the tip] further." *Id.* at 824; *see also Frazier*, 423 F.3d at 532 ("[I]n the absence of any indicia of the informants' reliability, courts insist that the affidavit contain substantial independent police corroboration."). In this case, the independent investigation did little to corroborate the tip or support the otherwise unreliable allegation that drugs would be found in the Yellowstone Parkway apartment.

Pointing out just how flawed the police investigation was here is not "Monday morning reasonableness." Maj. Op. at 17. And Sanders' reliance on cases in which law enforcement officers conducted routine police work to establish the necessary facts to provide the "minimally sufficient nexus" does not mean that his argument boils down to *requiring* that officers utilize any particular technique. *Cf. United States v. McClain*, 444 F.3d 556, 566 (6th Cir. 2005) (applying the good faith exception because "[t]here was indeed nothing more that [the officer] could have or should have done under these circumstances to be sure his search would be legal" (internal quotation marks and citation omitted)). Indeed, in cases where probable cause is obvious, it may be true that no additional police work is needed. *Allen*, 211 F.3d at 976. However, where probable cause is dubious or lacking, we have also held that further police work could furnish the necessary nexus. *See, e.g.*, *McPhearson*, 469 F.3d at 527 (noting that "heavy traffic to and from the residence" is a hallmark of drug dealing); *United States v. Abernathy*, 843 F.3d 243, 251–52 (6th Cir. 2016) (holding that drug paraphernalia recovered from a trash pull outside of the home supports a finding of probable cause when combined with other evidence of the resident's involvement in drug crimes).

Contrary to this precedent, the majority's consistent fallback position that the Fourth Amendment does not require any particular type of police investigation masks the dangerous conclusion that *anything* will suffice to make reliance on a warrant reasonable. But additional law enforcement efforts are unnecessary only when probable cause exists or when there is enough indicia of reliability that reliance on a tip is reasonable. Neither condition is present here. The answer to the majority's rhetorical question of "[w]hy would we require an officer to undertake an exhaustive investigation to confirm the probable cause that, to his mind, already existed?" is clear: because the Constitution requires it. Regardless, the inquiry is not about whether officers *believed* they had probable cause but rather whether their belief was *reasonable*. And our precedent establishes that reasonable officers corroborate unverified tips. *Helton*, 314 F.3d at 824; *Frazier*, 423 F.3d at 532. When such corroboration is easily done, the failure to conduct a basic investigation cannot, and should not, be so easily excused.

Second, beyond the uncorroborated tip, the affidavit lacked any factual allegations tying the apartment to criminal activity. A reasonable officer knows that a suspect's infrequent travel between an apartment and locations where drug dealing occurs falls short of establishing probable cause that the apartment contains evidence of a crime. *Cf. United States v. Savoca*, 761 F.2d 292, 297 (6th Cir. 1985) ("[A] suspect's mere presence or arrest at a residence is too insignificant a connection with that residence to establish that relationship necessary to a finding of probable cause." (internal quotation marks and citation omitted)). Further, a reasonable officer knows that a defendant exiting and entering an apartment on a few occasions does not establish that the defendant lives at that apartment. In considering the reasonableness of the officers' reliance on the warrant, it is impossible to ignore the ease with which officers could have uncovered Sanders' connection to the Yellowstone Parkway apartment. "A simple public records inquiry, further research into the name on the utilities accounts registered at the address, or additional surveillance would have provided clear evidence" of whether Sanders actually lived at the Yellowstone Parkway apartment. *United States v. Washington*, 380 F.3d 236, 251 (6th Cir. 2004) (Moore, J., dissenting).

Any reasonable officer would have known that it is illegal to search a residence when it is not clear that the suspect resides there and conducts illegal drug activity there, because there is not

a high probability that the desired evidence or contraband will be uncovered at that location.  In *Mills v. City of Barbourville*, a qualified immunity case that applied the identical good faith analysis, the affidavit at issue lacked any information meaningfully linking the place to be searched to the defendant, and was not supported by a statement from the informant that "identified the residence as the place of the drug purchase or . . . the home of" the defendant.  389 F.3d 568, 576–77 (6th Cir. 2004).  Accordingly, we determined that probable cause did not exist, and the deficient affidavit could not be saved by the good faith exception.  Using this guidance, law enforcement's mere observation of Sanders entering an apartment following a drug deal is insufficient to confer "some connection" between drug dealing and the residence.  Otherwise, the good faith exception would always apply to any deficient warrant to search any building that any suspected criminal entered following a crime.  But a civil society cannot tolerate such intrusions into the homes of its citizens.

Undaunted, the majority contends that this affidavit "is in line with others in which we found the existence of a minimally sufficient nexus."  Maj. Op. at 16.**³**  But, much like in its erroneous discussion of probable cause, the majority depends on cases in which this Court has applied the good faith exception to affidavits with more evidence than found in this case.  In *Higgins*, as discussed, this Court applied *Leon* where the informant told the officers that he had personally purchased drugs from the defendant at the defendant's address earlier the same day, and the tip was corroborated in multiple ways—a strikingly more detailed, relevant, and reliable tip than the informant's statements in this case.  In *Van Shutters*, this Court applied the good faith exception to a warrant that "describe[d] the premises with particularized detail" and "identifie[d] the items to be seized in an equally detailed fashion."  163 F.3d at 336.  The affidavit was so

---

**³**The majority chastises Sanders for basing his *Leon* challenges on the same grounds as his probable cause arguments.  While the majority is correct that the good faith exception "concerns the officer's objective blameworthiness," the analysis as to whether an affidavit was "bare bones" will necessarily inquire into the level of detail of the affidavit.  The two inquiries are distinct, *McPhearson*, 469 F.3d at 526, but they also ask overlapping questions: whether the warrant was deficient (probable cause) and whether the warrant was so deficient that a reasonable officer would not have relied on it (good faith exception).  Further, unlike today's majority, courts typically approach the good faith exception inquiry only when probable cause is wanting.  Thus, an affidavit that is so lacking in a sufficient nexus will fail to meet both the probable cause inquiry *and* the good faith exception.  The majority contradicts itself in this regard, identifying "three separate ties" between Sanders' drug dealing and the apartment.  Maj. Op. at 16.  This is the same evidence that the majority held was sufficient for probable cause.  The majority therefore commits the same error of which it accuses Sanders.

detailed, in fact, that we remarked that "only a police officer with extraordinary legal training would have detected any deficiencies" in it and that the level of detail gave rise to the "common sense inference . . . that the affiant visited the premises himself and presumably either observed [the defendant] in the residence, or determined through investigation that [the defendant] frequented the premises." *Id.* at 337–38. And *Schultz* likewise involved diligent corroboration of the informant's tip, extensive law enforcement investigation of a sophisticated drug-trafficking operation, as well as evidence that the safe deposit box belonged to the defendant and was likely connected to the at-issue criminal activity. *See* 14 F.3d at 1097–98. The level of detail found in *Van Shutters* and the level of corroboration found in *Schultz* are simply not present in this case. By inappropriately stretching these cases beyond their specific facts, the majority continues to hollow out the Fourth Amendment under the flimsy rationale that the affidavit could have been worse.

Despite its claims to the contrary, the majority, and Judge Mathis' concurrence, fail to identify any case in which this Court, or any other court, has applied the good faith exception in reliance on a warrant supported by information as sparse as the information in the affidavit in this case. *Cf. Washington*, 380 F.3d at 242–43 (applying the good faith exception where the defendant's car was registered to the address of the house, and affiant described his training and experience and why that caused him to believe that evidence would be found at the house). Judge Mathis' concurrence, which several of my fellow judges have joined for the conclusion that the affidavit meets the good faith exception, fails to even cite a case for the proposition that this affidavit was not "bare bones." That this conclusion is unsupported only strengthens the contention that, under our precedent, the good faith exception cannot and should not salvage this affidavit.

For its part, the majority sweeps imperative factual distinctions between this case and others under the rug, stating that "we do not ask nonlawyer officers to discern the fine legal distinctions between one case and the next." Maj. Op. at 18. This specious claim is at odds with well-established precedent that we expect officers to act reasonably, *Leon*, 468 U.S. at 922–23, and we expect reasonable officers to corroborate confidential tips, *Helton*, 314 F.3d at 824. In effect, the majority wants to have its precedential cake and eat it too. It tries to invoke inapposite

cases to argue that its holding today is merely a faithful application of existing case law. Yet when Sanders points out key factual distinctions between those cases and his own, or cites this Court's binding precedent that weighs in his favor, the majority scolds him for expecting too much of the officers tasked with investigating crime. It is not Sanders who imposes this burden, but rather the Fourth Amendment.

In sum, a reasonable officer would have known that an unreliable tip merited little, if any, weight, *see Helton*, 314 F.3d at 821–822, and that Sanders' travel to a residence—which the officers did not know or even suspect to be his—did not establish probable cause to believe that the residence would contain evidence of a crime. In considering the reasonableness of the officers' reliance on the warrant, it is inescapable that officers could have easily corroborated the alleged "tip" by conducting some independent investigation. The affidavit failed to draw any "plausible connection" to the apartment, *Brown*, 828 F.3d at 385, so the good faith exception should not apply to save the fruits of this illegal search. Because the majority, and Judge Mathis' concurrence, hold differently, one must wonder what would *not* meet the minimally sufficient nexus, under their ever-lowering standards? The unfortunate truth is that a majority of this Court would uphold virtually any search under the good faith exception—no matter how at odds with our precedent, the Fourth Amendment's constitutional mandate, or even the original intent behind *Leon*.

When *Leon* was decided in 1984, the Supreme Court thought it was applying an exception to the exclusionary rule that would apply in a limited number of cases. *Leon*, 468 U.S. at 916 n. 14 ("[W]e are not convinced that this is a problem of major proportions."). Instead, the seemingly innocuous good faith exception has proven to be an exception that swallows the rule. More and more, courts forgive the admission of illegally obtained evidence under the auspices of the good faith exception, blessing even the most alarming cases of police misconduct. A recent study analyzing a representative sample of Fourth Amendment suppression cases found that the good faith exception is applied in 77% of federal cases in which it is discussed.[4] Matthew J. Tokson & Michael Gentithes, *The Reality of the Good Faith Exception*, 113 Georgetown L.J. (forthcoming

---

[4]This percentage was calculated by dividing the total number of federal cases in the study applying the good-faith exception (123) by the total number of federal cases in the study discussing the good-faith exception (159). The authors of this study took a representative sample of every case "mentioning the Fourth Amendment or a motion to suppress during the months of July 2015, July 2018, and July 2021."

2025).  In a staggering three-quarters of cases, judges excuse constitutional violations by finding an officer's actions in subverting the Fourth Amendment reasonable.  Twenty years ago, Judge Boyce F. Martin, Jr. wrote in dissent that "[r]egrettably, we have descended further down that slippery slope of post-hoc rationalization, where everything that the police do becomes acceptable when viewed in retrospect."  *Carpenter*, 360 F.3d at 604 (Martin, J., dissenting).  Two decades later, the problem has only gotten worse, as courts have effectively lowered the probable cause standard, required by the Fourth Amendment, to a "minimally sufficient nexus"—which this affidavit does not even meet.

It is not as if no one saw this coming.  Indeed, Justice Brennan's prescient dissent in *Leon* predicted that "[s]ince in close cases there will no longer be any incentive to error on the side of constitutional behavior, police would have every reason to adopt a 'let's-wait-until-it's-decided' approach in situations in which there is a question about a warrant's validity or the basis for its issuance."  *Leon*, 468 U.S. at 955 (Brennan, J., dissenting).  Rather than limit the good faith exception to cases in which deterrence is allegedly impossible, as *Leon* professed to do, *Leon* instead created a system in which officers have little incentive to investigate more, to ensure their warrants are supported by probable cause—in other words, to comply with the Constitution. Instead, an officer's mistake, in the best case scenario, and misconduct, in the worst, will have "virtually no consequence," as the unconstitutionally-seized evidence will be admitted either way. *Id.* at 956.  What was predicted then has been proven now, especially by the majority's decision and the concurrences' tolerance of this new regime.  This Court has continually sent a message to law enforcement that it no longer needs to worry about the sufficiency of a search warrant affidavit—a nexus can be so minimal as to be non-existent.  And no officer will face accountability, in the form of suppressed evidence or otherwise, for flagrantly violating the Constitution.  All of this is true under the framework endorsed by the majority and concurrences.  But I refuse to participate in this movement to obliterate the Fourth Amendment's protections for all individuals, including and especially those suspected of wrongdoing.

Aside from the inevitable admission of illegally-seized evidence, today's decision has the unfortunate and avoidable consequence of lowering the bar for police entry into the most sacred of places: the home.  Time and time again, we have seen the disastrous results when police, as in

this case, depend on unreliable tips without conducting proper surveillance to confirm a residence's connection with criminal activity. *See, e.g.,* William K. Rashbaum, *Woman Dies after Police Mistakenly Raid Her Apartment*, N.Y. Times (May 17, 2003), https://www.nytimes.com/2003/05/17/nyregion/woman-dies-after-police-mistakenly-raid-her-apartment.html (police broke down the door of a 57-year-old woman's apartment based on a drug dealer informant's tip that his supplier stored guns and drugs there); Radley Balko, *Still Waiting for Justice after SWAT Team Member Kills Innocent Grandfather*, Wash. Post (Jan. 6, 2015), https://www.washingtonpost.com/news/the-watch/wp/2015/01/06/still-waiting-for-justice-after-swat-team-member-kills-innocent-grandfather/ (police shot and killed a 68-year-old grandfather during a drug raid at his home after two confidential informants alleged they had purchased drugs from the grandfather's stepson); Ernie Suggs, *City to Pay Slain Woman's Family $4.9 Million*, Atlanta. J.-Const. (Aug. 16, 2010), https://www.ajc.com/news/local/city-pay-slain-woman-family-million/GWqsgDArzmOhvpb7iPY6FI/ (police shot and killed a 92-year-old woman while executing a warrant on her home using information provided by an informant who claimed to have purchased drugs in her house). It is little consolation that police found drugs at the Yellowstone Parkway apartment and that, thankfully, no one was hurt. Today's decision makes it easier for law enforcement to enter *anyone's* home, so long as there is a tenuous connection to someone suspected of wrongdoing. Permitting the police, armed with weapons, to cross the threshold of the home is a serious breach of a constitutionally protected area with a potential for violent consequences. But the majority fails to grapple with the fact that its holding makes such grave situations more likely, making today's decision all the more dangerous.

### III. Rule 16

Because I would reverse the district court's denial of Sanders' motion to suppress on the grounds that the search was not supported by probable cause and cannot be saved by the good faith exception, I would not reach the Federal Rule of Criminal Procedure 16 evidentiary issue. Even if I did, I would not come to the same conclusion as the majority, because I believe that the majority's analysis bestows an insurmountable burden upon criminal defendants—a particularly perplexing result given that, at the Rule 16 stage, criminal defendants are merely seeking discovery with respect to the government's evidence against them.

Sanders sought discovery of evidence pertaining to the controlled purchases underlying the search warrant to "assess the circumstances leading to the search of his home" and "meaningfully challenge the validity of the search warrant affidavit on those grounds." Def.'s Br., ECF No. 23, 15. In his view, the information was material to his defense because it may have exposed deficiencies in the search warrant affidavit such that he could prevail on a motion to suppress. The district court denied Sanders' discovery motion, finding that the sought-after information's connection to the government's case-in-chief was "too attenuated to be material under Rule 16(a)(1)(E)(i)." Op. and Order, R. 31, Page ID #197. The majority, in affirming the district court, adds additional requirements to Rule 16 that neither the text of the rule nor our precedent demands.

First, the majority unnecessarily interprets Rule 16(a)(1)(E)(i) and misreads *United States v. Armstrong*, 517 U.S. 456 (1996), as preventing a criminal defendant from seeking discovery related to the search warrant used to seize the evidence being introduced against him because such evidence is not sufficiently related to his "defense." Claiming that *Armstrong* requires such a result, the majority holds that Sanders has not made an adequate showing that the evidence he seeks will combat the government's case-in-chief. But *Armstrong* held only that criminal defendants cannot use Rule 16 to seek discovery of evidence to aid a selective prosecution claim because, the Supreme Court reasoned, Rule 16 can be used only as a "shield" mechanism to attack the government's case-in-chief, as opposed to a "sword" mechanism to challenge the prosecution's conduct of the case. *Armstrong*, 517 U.S. at 462–63. This reasoning does not foreclose Sanders' arguments. The type of discovery Sanders sought—that related to the search warrant used to seize the evidence being introduced against him—fits squarely in the "shield" definition. The government relied on the seized evidence in pursuing a conviction, and suppression of that evidence would certainly harm the government's case-in-chief. That is, unlike a selective prosecution claim—"that the prosecutor has brought the charge for reasons forbidden by the Constitution," *id.* at 463—which is entirely collateral to the case against the defendant, here the discovery Sanders sought could have vitiated the government's case against him.

Second, the majority, and the concurrence that focuses on Rule 16, too narrowly interprets "materiality" to put discovery out of reach for the vast majority of, if not all, criminal defendants. The majority states that Sanders must make a threshold showing that discovery will establish that

"he did not possess the guns or narcotics found at the apartment." Maj. Op. at 25. But *Armstrong* says no such thing. 517 U.S. at 463 (observing that Rule 16 requires only that a defendant seek "documents material to the preparation of their defense against the Government's case in chief"). There are myriad ways to make such showing beyond the majority's apparent misunderstanding that "material" means directly "exculpatory." In contrast to the majority's impossibly high bar, our precedent solely requires "an indication that pre-trial disclosure would have enabled the defendant to alter the quantum of proof in his favor." *United States v. Lykins*, 428 F. App'x 621, 624 (6th Cir. 2011) (citation omitted).

Sanders easily meets that standard. If Sanders were able to obtain evidence that supported his arguments that the evidence from the apartment was seized illegally, allowing him to suppress the most inculpatory evidence against him, then that would certainly alter the quantum of proof in his favor. This basic arithmetic of a criminal trial seems to elude the majority, which instead stubbornly maintains that the evidence Sanders seeks would not change the fact that law enforcement discovered drugs and firearms in Sanders' bedroom. But "[i]n assessing materiality, we consider the logical relationship between the information withheld and the issues in the case, as well as the importance of the information in light of the evidence as a whole." *Lykins*, 428 F. App'x at 624. Sanders was convicted of crimes based on evidence law enforcement found in the apartment. The method and procedures by which law enforcement collected that evidence— including the controlled buys and the information provided in the warrant affidavit—is of the utmost importance to his case. And depriving Sanders of discovery in this manner cannot be deemed mere harmless error. If he were able to access information during discovery that would conclusively determine that the evidence was illegally obtained such that it should be suppressed, then the gun and drugs found in the apartment would not be able to be introduced against him. Instead of appreciating this commonsense conclusion, the majority seems to hold that, unless a defendant makes a highly specific discovery request that would produce evidence that would fully exonerate him or her, the Rule 16 request must be denied.

It is also worth noting that interpreting "material" and "defense" as two separate prongs is a concept newly fashioned by the majority rather than an application of existing precedent. Rule 16 requires that defendants seek discovery that is "material to preparing the defense." Fed. R.

Crim. P. 16(a)(2)(E)(i). Consistent with this text, *Lykins* implies that if a defendant shows that discovery is relevant to his defense, then it is material. 428 F. App'x at 624. But the majority reinterprets Rule 16 to separate "material" from "defense," and sets too high a bar for each prong. The law requires neither of these results. Rather, the operative definitions of what qualifies as a "shield" or "materiality" are relatively untrodden ground for us. When given the opportunity to allow criminal defendants, already vulnerable to the Goliath-like powers of the state in an adverse proceeding, to merely seek relevant information about the case against them, this Court should rule in their favor. Instead, this Court continues to chip away at any right or remedy criminal defendants may have. Criminal defendants who seek discovery to defend against the government's case against them already face an impossible task: they must make a substantial showing that they are entitled to discovery under the confines of Rule 16, but they are frequently unable to make such a showing without the benefits of discovery. Today's decision only exacerbates the problem. By the majority's counter-intuitive approach, criminal defendants need discovery to show that they need discovery. This misinterprets the Federal Rules of Criminal Procedure, unduly preventing criminal defedants from having a fair opportunity to defend against the charges of the state.

## CONCLUSION

The majority finds that probable cause supported the search of an apartment based on the scant evidence that a suspect with no confirmed connection to the residence entered it after two controlled buys away from the residence. Nothing in our precedent demands this result, and the Constitution forbids it. Today's decision is yet another in a long line of cases that reaches for any excuse to bless a deficient warrant and allow unconstitutionally seized evidence in the courtroom. The Fourth Amendment, drafted to protect against general warrants and the capricious authority of the state, could and should have prevented such a result. But rather than actually constrain police power, the Fourth Amendment has suffered a death by a thousand cuts at the hands of this Court, which renders this key constitutional safeguard a nullity while professing otherwise. Defendants, and, in fact, anyone who wishes to be secure against the arbitrary whims of a tyrannical government, deserve better. I therefore respectfully dissent.